[No. C065700. Third Dist. Dec. 9, 2011.]

S.Y., Plaintiff and Respondent, v.
S.B., Defendant and Appellant.

## Counsel

Law Office of Elizabeth N. Niemi, Elizabeth N. Niemi; Bartholomew & Wasznicky, Diane E. Wasznicky; and C. Athena Roussos for Defendant and Appellant.

Wald Law Group, Wald & Thorndal, Deborah H. Wald and Paul W. Thorndal for Plaintiff and Respondent.

Shannon P. Minter, Melanie S. Rowen, Catherine Sakimura and Ilona M. Turner for National Center for Lesbian Rights as Amicus Curiae on behalf of Plaintiff and Respondent.

## Opinion

**BLEASE, Acting P. J.**—S.B., the adoptive mother of G.B. and M.B., appeals from a judgment declaring that her former same-sex partner S.Y.[1] is a presumed parent of the children under Family Code section 7611, subdivision (d) (hereafter section 7611(d)).[2] S.B. contends the trial court erred in finding S.Y. is a presumed parent because she never "actually received the children into her *own* home" or "*openly* held the children out as her own *natural* children," as required under section 7611(d). She also asserts that the trial court abused its discretion in concluding this was not an appropriate action in which to rebut the parentage presumption (§ 7612, subd. (a)), and that recognizing S.Y. as a parent violated S.B.'s right to substantive due process by interfering with her interest in the care, custody, and management of her children.

We shall conclude the trial court did not err in finding that S.Y. is a presumed parent of G.B. and M.B. Substantial evidence supports the trial court's findings that (1) S.B.'s home served as the family home, and S.Y.

---

[1] In order to protect the confidentiality of the minors, we shall refer to the parties and the minors by their initials.

[2] Further undesignated statutory references are to the Family Code.

received the children into that home, and (2) S.Y. openly held the children out as her natural children. As we shall explain, whether S.B. intended S.Y. to obtain legal rights with respect to the children is irrelevant where, as here, S.B. allowed and encouraged S.Y. to function as the children's second parent from birth, and S.Y. openly embraced the rights and obligations of being a parent. We shall further conclude that the trial court acted well within its discretion in finding that S.B. failed to rebut the parentage presumption. Finally, we shall reject S.B.'s claim that recognizing S.Y. as a parent infringes upon her fundamental right to make decisions concerning her children. Accordingly, we shall affirm the judgment.[3]

## FACTUAL AND PROCEDURAL BACKGROUND

On September 24, 2009, S.Y. filed a petition in the trial court seeking to be declared the second, same-sex parent of nine-year-old G.B. and five-year-old M.B., both of whom were adopted by S.B. at birth. (§§ 7630, subd. (a)(1), 7611(d).) The trial court found there was a factual dispute and set the matter for trial.

A court trial was held on February 25 and 26, 2010. The following evidence was adduced at trial.[4] S.Y. and S.B. met in 1993 and were in a committed relationship for 13 and one-half of the past 16 years—between 1993 and 2009. During the majority of their relationship, S.Y. and S.B. maintained separate residences; however, S.Y. spent "[v]irtually every night" at S.B.'s house. She slept at S.B.'s house, in S.B.'s bed, at least three or four nights a week and was there every weekend and after work on nights she did not sleep over.

S.Y. worked as a senior planner in the Community Development Department for the City of Sacramento and served as a colonel in the United States Air Force Reserves. She was a member of the second class of women to graduate from the Air Force Academy and had been a member of the Air Force for nearly 30 years. S.B. worked as a kindergarten teacher.

---

[3] We previously denied S.Y.'s motion to dismiss the appeal on the ground the judgment was nonappealable and granted S.B.'s requests for calendar preference, to expedite the appeal, and to keep the record confidential.

[4] In light of S.B.'s contentions on appeal, we set forth the evidence adduced at trial in the light most favorable to the judgment, resolving all conflicts and drawing all inferences in favor of that verdict, and deferring to all implicit credibility determinations of the trier of fact. (*Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 361, 368–369 [96 Cal.Rptr.3d 26] (*Charisma R.*).) In addition to testifying in person, at trial S.Y. presented the court with a timeline detailing her involvement with the children during each year of their lives, and the parties stipulated that S.Y. would testify to everything in the timeline as submitted.

In 1994, S.B., who had always dreamed of having children, actively began attempting to have a child through artificial insemination. While it had not been S.Y.'s dream to have a child, S.Y. told S.B. that she would support S.B. in pursuing her dream, and that if S.B. was fortunate enough to have a child, S.Y. would coparent the child with her. A few years later, when S.B.'s efforts to conceive a child proved unsuccessful, she contemplated having in vitro fertilization and asked S.Y. to help pay for it. S.Y. initially was unwilling to help pay the nearly $40,000 it would cost for in vitro fertilization because of the low chance of success given S.B.'s age and medical factors. Several days later, S.Y. told S.B. she would help pay for in vitro fertilization, but by then, S.B. had decided to pursue adoption, with S.Y.'s support and encouragement.

In 1998, S.B. was chosen by a birth mother, and S.Y. helped S.B. prepare for the baby's arrival. Although that adoption ultimately fell through, the next year, S.B. was chosen by another birth mother.

G.B. was born in November 1999. S.Y. accompanied S.B. to Redding for his birth, obtaining time off from her job with the City of Sacramento to do so. S.Y. told her supervisor, who was aware of her relationship with S.B., that she would be accompanying S.B. to Redding for the birth of a child she would coparent. S.Y. was in the hospital waiting room during G.B.'s birth, and after he was born, S.B. brought him out to show her. S.Y. stayed in Redding until S.B. and G.B. were ready to come home. When G.B. was released from the hospital, S.B., S.Y., and G.B. returned to Sacramento together. S.Y. stayed with S.B. and G.B. most nights and every weekend, assisting in G.B.'s care as much as S.B. would allow. She changed his diapers, helped bathe him, played with him, and prepared formula for S.B. to provide using a device designed to simulate breastfeeding. She paid for the updated home study for G.B.'s adoption and purchased necessities, including formula, diapers, and baby food. In 2000, shortly after G.B. was born, S.Y., S.B., and G.B. travelled to Hawaii, and later went to Texas to visit S.Y.'s parents.

In 2003, S.Y. sought to be named G.B.'s guardian in the event something happened to S.B. She and S.B. contacted an attorney to make that happen, but S.B. cancelled the appointment.

In June 2003, the parties broke up. The breakup lasted two and one-half years. During that time, S.Y. remained active in G.B.'s life, except when S.B.

interfered with her efforts.[5] S.Y. continued to go to S.B.'s home most evenings and every weekend to spend time with G.B. and to assist with his care. She also continued to go on outings and vacations with S.B. and G.B. When S.Y. was promoted to the rank of colonel in April 2004, S.B. and G.B. participated in the pinning of the epaulets ceremony, a privilege reserved for family. The ceremony took place in front of approximately 65 of S.Y.'s family, friends, and colleagues.

While S.Y. and S.B. were broken up, S.B. decided to adopt another child. Because they were not together, S.Y. did not then have an expectation of coparenting a second child with S.B. and told S.B. so in an e-mail.

In mid-2004, S.B. was selected by a birth mother who lived in Minnesota. M.B. was born in July 2004. S.Y. did not accompany S.B. to Minnesota for M.B.'s birth, but when the adoption process was delayed, she flew to Minnesota at S.B.'s request to assist with G.B. M.B.'s middle name is a combination of S.Y.'s middle name and the birth mother's name.

Following M.B.'s birth, S.Y. continued to go to S.B.'s home most evenings and every weekend to spend time with the children and to assist with their care, except when S.B. interfered with her efforts.[6] She also participated in all birthdays and holiday celebrations and continued to go on outings and vacations with S.B. and the children.

In November 2005, the parties reconciled, and S.Y. resumed spending most nights at S.B.'s and stopping by on other nights to spend time with the children. Had it not been for the children, it is doubtful S.Y. would have resumed her relationship with S.B.

When each child reached the age of about one year old, S.Y. set up college savings accounts, in which she continued to make monthly contributions. She named the children as beneficiaries on "everything [she had]," including her life insurance policy and mutual funds. She displayed photographs of the children and S.B. in her cubicle at work for everyone to see. She brought S.B. and the children to family events organized through her work, such as company picnics and "Pops in the Park." Although S.Y. referred to herself as the

---

[5] From October 2003 until Thanksgiving 2003, and from January 2004 through mid-March 2004, S.B. refused to allow S.Y. to see or talk to G.B. S.Y. sent cards several times a week and left messages during the times S.B. precluded her from seeing G.B.

[6] In February 2005, S.B. refused to allow S.Y. to see or talk to the children. That lasted for approximately three and one-half months, when the parties returned to couples counseling.

children's "godparent," her supervisor understood "she was in her role as the parent." Through her actions, S.Y. made it obvious to her supervisor that she "was claiming that the individuals in those pictures [in her cubicle] were her family." S.Y. regularly worked in G.B.'s classroom (roughly 40 times) since he began attending school. G.B.'s second grade teacher referred to her as "a parent, adult volunteer . . . ." She attended back-to-school nights, open houses, field trips, and other school functions. She attended all of G.B.'s baseball games and most of his practices over the years. During the years the parties were together, S.B. and the children gave S.Y. Mother's Day cards.

In 2006, S.Y.'s parents, to celebrate their 50th wedding anniversary, took their entire family, including S.Y., S.B., and the children, on a cruise. S.Y.'s mother watched S.Y. interact with the children and described her as "just another parent." S.Y. got the children ready and attended to their needs. S.Y.'s mother testified that during one visit to Texas, G.B. was ill and S.Y. cleaned up his vomit, demonstrating the teamwork the parties showed as parents.

S.Y.'s parents considered G.B. and M.B. as their grandchildren by S.Y. They contributed $3,000 each to G.B.'s and M.B.'s college accounts, as they had done for their other grandchildren. They celebrated Christmas with S.Y., S.B., and the children at S.B.'s home, as well as at S.B.'s mother's home. On a visit to Sacramento, S.Y.'s mother accompanied S.Y. to G.B.'s daycare.

In 2007 and 2008, S.Y., S.B., and the children travelled to Texas to visit S.Y.'s family and went on a number of family vacations.

In November 2007, S.Y. and S.B. purchased a home together, which had yet to be built. Both of their names appeared on the contract. They decided to sell S.Y.'s home because she had more equity. S.Y.'s home was sold while she was deployed to Kuwait. When S.Y. returned in May 2008, she moved in with S.B. When the builder failed to begin construction on the new home, they terminated the contract. S.Y. continued to live with S.B. for eight months until she moved into a nearby apartment.

Between 1998 and 2009, S.Y. spent in excess of $90,000 on family-related expenses, including baby supplies, groceries, school lunches, an updated home study for G.B.'s adoption, karate and gymnastics lessons for G.B. and M.B., a backyard play structure, meals, family vacations, family pets, couples counseling, therapy for G.B., and home security services.[7]

---

[7] S.Y. submitted a spreadsheet detailing a total of $91,895.71 that she had contributed to S.B. and the children during the years 1998 to 2009. The items included in the spreadsheet were limited to those for which she had documentation. Two and one-half years were missing from the spreadsheet because she did not have any documentation for those expenditures.

S.Y. believed her position in the military precluded her from adopting the children or formalizing her relationship with S.B. She also believed that under the military's "Don't Ask, Don't Tell" policy (10 U.S.C. § 654), doing any of those things would have jeopardized her 30-year career in the military and could have resulted in her being court martialed and going to prison.[8] In addition, S.Y. testified that S.B. would never have allowed her to adopt the children, and until recently, she believed the law precluded her from adopting the children and would not otherwise recognize her parental rights.

In July 2009, S.Y. ended her relationship with S.B. In August 2009, S.B. advised S.Y. that she would not allow her to have any contact with the children. S.Y. contacted a lawyer the next business day and filed the underlying petition on September 24, 2009.

In January 2010, G.B. twice called S.Y. from a friend's cellular telephone. In a voicemail message he stated that he loved her, missed her, and wished he could see her again. S.B. testified that G.B. knew three cell phone numbers: S.B.'s, S.Y.'s, and S.B.'s sister's numbers.

Having considered the evidence in its totality, the trial court found S.Y. showed by a preponderance of the evidence that she received the children into her home and held them out as her own. In particular, the court found that while the parties maintained separate residences, they shared "a blended home," noting that S.Y. was at S.B.'s home three to four nights a week, sleeping in S.B.'s bed, and taking care of the children. The court also found that S.Y. "not only accepted the rights and obligations of being a parent, she embraced them . . . [and] demonstrated a full commitment to these children." The court concluded that S.B. failed to rebut the presumption of parentage and "did not make any effort to do so." The court noted, among other things, that "[a]llowing the presumption to be rebutted in this case would leave the children with only one parent and this result would be contrary to the public policy favoring a child having two parents to provide emotional and financial support." Finally, the court declined to include S.B.'s constitutional claims in its statement of decision because they were not " 'principal controverted issues at trial.' "

---

[8] At all times relevant herein, that policy stated in pertinent part that "[a] member of the armed forces shall be separated from the armed forces under regulations prescribed by the Secretary of Defense if one or more of the following findings is made . . . [¶] (1) That the member has engaged in, attempted to engage in, or solicited another to engage in a homosexual act . . . [¶] . . . [¶] (2) That the member has stated that he or she is a homosexual or bisexual, or words to that effect, . . . [¶] (3) That the member has married or attempted to marry a person known to be of the same biological sex." (10 U.S.C. § 654(b).) The "Don't Ask, Don't Tell" statute, 10 United States Code section 654, was repealed September 20, 2011. (See *Log Cabin Republicans v. United States* (9th Cir. 2011) 658 F.3d 1162, 1165.)

## DISCUSSION

■ Whether the trial court erred in determining that S.Y. is a parent of G.B. and M.B. is governed by the Uniform Parentage Act (UPA) (§ 7600 et seq.) The UPA defines the " '[p]arent and child relationship' " as "the legal relationship existing between a child and the child's natural or adoptive parents . . . ." (§ 7601.) Under the UPA, a woman is presumed to be the natural mother of a child if she "receives the child into h[er] home and openly holds out the child as h[er] natural child." (§ 7611(d).)[9] "A [wo]man who claims entitlement to presumed [mother] status has the burden of establishing by a preponderance of the evidence the facts supporting h[er] entitlement. [Citation.] . . . The Family Code section 7611(d) presumption, once it arises, 'may be rebutted in an appropriate action only by clear and convincing evidence.' " (*In re J.O.* (2009) 178 Cal.App.4th 139, 147–148 [100 Cal.Rptr.3d 276], quoting § 7612, subd. (a).)

We review the trial court's factual findings, including its findings that S.Y. received the children into her home and openly held them out as her natural children, under the substantial evidence standard. (*Charisma R., supra,* 175 Cal.App.4th at p. 368; *In re A.A.* (2003) 114 Cal.App.4th 771, 782 [7 Cal.Rptr.3d 755].) " 'Under that standard, we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is any substantial evidence, contradicted or uncontradicted, in support of the judgment.' " (*Charisma R., supra,* 175 Cal.App.4th at p. 369.) To the extent we are called upon to review the trial court's legal interpretation of the "receiving" and "holding out" requirements set forth in section 7611(d), we shall exercise our independent legal judgment. (See *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 796 [35 Cal.Rptr.2d 418, 883 P.2d 960].) We review the trial court's determination that there is no basis to rebut the parentage presumption for abuse of discretion. (*Charisma R., supra,* 175 Cal.App.4th at p. 378.)

---

[9] Although section 7611 speaks in term of fathers, the UPA expressly provides that the provisions applicable to determining a father-child relationship shall be used to determine a mother and child relationship "[i]nsofar as practicable . . . ." (§ 7650; see also *Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 119–120 [33 Cal.Rptr.3d 46, 117 P.3d 660] (*Elisa B.*) [" 'Though most of the decisional law has focused on the definition of the presumed father, the legal principles concerning the presumed father apply equally to a woman seeking presumed mother status.' "].)

I

## The Trial Court Did Not Err in Finding That S.Y. Received the Children into Her Home

S.B. contends "[S.Y.] failed to satisfy the receiving requirement because she never brought the children into her own house." S.B.'s argument is premised on the fact that the children did not live with or regularly visit S.Y. at her separate residence. As we shall explain, there is ample evidence to support the trial court's finding that S.B.'s home served as the family home, and that S.Y. received the children into their joint home.

Prior to G.B.'s birth, S.Y. spent virtually every night at S.B.'s. The parties were together when S.B. attempted to conceive through artificial insemination, and S.Y. was present for the ups and downs of that process. When that process proved unsuccessful, S.B. asked S.Y. to help pay for her to have in vitro fertilization, which S.Y. initially refused to do. Later, S.Y. agreed to help pay for the procedure, but by then, S.B. had decided to adopt a child, with S.Y.'s encouragement and support. S.Y. accompanied S.B. to Redding for G.B.'s birth, and after they returned to Sacramento, she continued to spend three to four nights a week at S.B.'s home, sleeping in S.B.'s bed and helping to care for G.B. On the nights she did not sleep there, she stopped by after work to see G.B. and assist in his care. Since that time, S.Y. has remained active in G.B.'s life, except for those periods when S.B. prohibited her from seeing him.

While S.B. and S.Y. were not together when M.B. was born, S.Y. continued to go to S.B.'s on weeknights and on weekends to spend time with and care for G.B., which inevitably included helping to care for M.B. When the parties reconciled in 2005, S.Y. resumed sleeping at S.B.'s at least three to four nights a week and was there after work on the nights she did not spend the night, assisting in the children's care. Since that time, S.Y. has remained active in M.B.'s life, except for those periods when S.B. prevented her from seeing the children.

That S.Y. also maintained a separate residence does not undermine the court's finding that she received the children into her home. In *In re A.A., supra*, 114 Cal.App.4th at page 784, the court adopted an expansive interpretation of the "receives" requirement, holding that the trial court erred in refusing to find a man a presumed father under section 7611(d) even though the child never actually lived with him. The court reasoned that "when a mother and father of a child are not inclined to live with each other, their child often lives with only one of the parents and visits the other. . . . Although the minor was not received into R.B.'s home to live with him on a

full-time basis, he was involved with the minor from the very beginning, with Mother's blessing. . . . [W]hen his own son, R., came to visit him, so also did the minor child, whom the record shows was bonded with R. Additionally, R. B. provided financially for the minor's needs, buying her clothes, toys and food, and other essentials." (114 Cal.App.4th at p. 784.)

The same is true here. While S.Y. did not live with S.B. and the children on a full-time basis, she slept at S.B.'s more than half the time, and was there most other nights and on weekends. She cared for both children from the very beginning, with S.B.'s blessing, and provided for them financially.

S.B. argues the trial court erred in relying on the fact that S.Y. spent most nights at S.B.'s because S.Y. would have stayed there "regardless of her parentage claim." In *In re Spencer W.* (1996) 48 Cal.App.4th 1647 [56 Cal.Rptr.2d 524], the court found substantial evidence supported the trial court's rejection of a man's claim to presumed father status where "[t]he evidence permitted the conclusion that . . . mother permitted [the man] to reside in her home, and that [the man's] residence with [the child] was not demonstrative of [the man's] commitment to the child but reflected that [he] acted out of personal convenience and self-interest." (*Id.* at p. 1653, italics omitted.) Such evidence included the following: "(1) mother paid for the apartment (and apparently most other expenses); (2) she supported [the man, who was] unemployed . . . ; and (3) when mother's funding ceased [the man] stopped residing with [the child]." (*Ibid.*)

In contrast, here, S.Y. was not financially dependent upon S.B. She maintained a separate residence but chose to stay at S.B.'s, at least in part, to be with and help care for the children. Indeed, after S.Y. broke up with S.B. in 2003, she continued to go to S.B.'s house after work and on weekends to spend time with and help care for G.B. As the trial court found, "This is not a case where a person cared for the children of someone she was dating just because she happened to be dating the other. It's actually quite the reverse. The relationship between the parties lasted longer than it otherwise would have for the sake of the children and because [S.Y.] was devoted to the children. This is not a case where [S.Y.] just cared for the kids because it was convenient or because of self-interest. [S.Y.] made personal, professional and financial sacrifices to care for the children. A person occasionally spending the night on the couch would not do all of the things [S.Y.] did—would not clean up the children's vomit, set up college accounts, pay for their therapy, volunteer at the school, name the children as beneficiaries, and act in the myriad [of] other ways [S.Y.] did, as a parent."

We likewise reject S.B.'s assertion that the trial court's finding created "an exception to the receiving requirement under what it called a 'blended home'

theory pursuant to which [S.Y.]'s regular overnight stays at [S.B.]'s house sufficed." The trial court found, under the totality of the circumstances, including the fact that S.Y. spent at least three to four nights a week at S.B.'s, that S.B.'s house served as the parties' joint home, and thus, S.Y. received the children into *her home*. As previously discussed, the trial court did not err in so finding.

## II

### The Trial Court Did Not Err in Finding That S.Y. Openly Held G.B. and M.B. Out as Her Natural Children

S.B. contends there is insufficient evidence to support the trial court's finding that S.Y. openly held G.B. and M.B. out as her natural children.[10] As we shall explain, there is ample evidence to support the trial court's finding.

The parties were in a committed relationship during the time S.B. sought to conceive and then adopt. S.Y. told S.B. that she would support her and coparent a child should S.B. be fortunate enough to have one. S.Y. paid for the updated home study for G.B.'s adoption. She took time off from her job to be present for G.B.'s birth and told her supervisor the reason for her absence. She accompanied S.B. to Redding for G.B.'s birth and waited at the hospital until he was born. She flew to Minnesota following M.B.'s birth to help care for G.B. When S.B. returned to Sacramento following M.B.'s birth, S.Y. helped care for both children. She allowed S.B. to use her middle name as part of M.B.'s middle name. She displayed pictures of S.B. and the children in her cubicle at work for everyone to see. She brought S.B. and the children to work-related functions typically attended by family. She regularly worked at G.B.'s school, attended back-to-school nights, and other school

---

[10] In support of her contention, S.B. cites *In re T.R.* (2005) 132 Cal.App.4th 1202, 1211 [34 Cal.Rptr.3d 215], where the court noted: "In determining whether a man has 'receive[ed a] child into his home and openly h[eld] out the child' as his own [citation], courts have looked to such factors as whether the man actively helped the mother in prenatal care; whether he paid pregnancy and birth expenses commensurate with his ability to do so; whether he promptly took legal action to obtain custody of the child; whether he sought to have his name placed on the birth certificate; whether and how long he cared for the child; whether there is unequivocal evidence that he had acknowledged the child; the number of people to whom he had acknowledged the child; whether he provided for the child after it no longer resided with him; whether, if the child needed public benefits, he had pursued completion of the requisite paperwork; and whether his care was merely incidental. [Citations.]" However, "*In re T.R.* does not require an alleged parent to show each and every one of these factors exists. Instead, it lists *the types of factors* trial courts *may* consider." (*Charisma R., supra*, 175 Cal.App.4th at p. 376, italics added.) As we shall explain, here, the trial court considered the appropriate factors in determining S.Y. is a presumed parent and there was ample evidence of a parental relationship between S.Y. and the children to support the trial court's determination.

events. She attended all of G.B.'s baseball games and most practices. She named the children as beneficiaries on everything she had. She went on numerous family vacations with S.B. and the children. She took S.B. and the children to visit her family in Texas numerous times. S.Y.'s parents considered and treated G.B. and M.B. as their grandchildren. S.Y.'s parents took S.Y., S.B., the children, along with the rest of their family, on a cruise to celebrate their 50th wedding anniversary; spent Christmas holidays with S.Y., S.B. and the children; and contributed to the children's education savings accounts as they did for their other grandchildren. S.Y. had G.B. participate in the ceremony recognizing her promotion to the rank of colonel, an honor reserved for family, in front of numerous friends and coworkers. S.B. and the children gave S.Y. Mother's Day cards year after year.

While S.B. may not have intended that S.Y. obtain any legal rights to the children, the record is replete with evidence that she not only allowed, but encouraged, S.Y. to coparent both children from the beginning. Among other things, she did not object when S.Y. told her she would coparent a child with her should she be fortunate enough to have one; she asked S.Y. to share in the cost of in vitro fertilization, which S.Y. eventually agreed to do; she asked S.Y. to accompany her to Redding for G.B.'s birth; she shared her home with S.Y.; she allowed S.Y. to care for the children since birth; she took the children on numerous vacations with S.Y.; she took the children to visit S.Y.'s parents in Texas; she took the children on a cruise with S.Y. and S.Y.'s extended family to celebrate S.Y.'s parents' anniversary; she took the children to various activities organized by S.Y.'s work; she arranged for S.Y. to regularly work in G.B.'s classroom; she allowed S.Y. to provide for the children financially; and she did not object when S.Y. set up college savings accounts for the children.[11]

■ In sum, the trial court did not err in finding that S.Y. met her burden of establishing she received the children into her home and held them out as her natural children.[12] ■ Our conclusion is consistent with the purpose behind the presumed parent designation, which "is to distinguish between

---

[11] Contrary to S.B.'s assertion, S.Y.'s parentage claim is not barred by the statutes of limitations applicable to actions seeking to challenge an adoption order. S.Y.'s parentage claim is based on section 7611(d). She does not seek to "vacate, set aside, or otherwise nullify" the adoption order related to G.B. or M.B. (§ 9102, subd. (a).) Accordingly, neither the one- nor the three-year statute of limitations applicable to such actions (§ 9102) applies. S.B. asserts, for the first time in her reply brief, that granting S.Y. presumed parent status circumvents adoption laws. She makes no attempt to explain why the point was not raised earlier. Seeing no reason for the failure, we decline to address the point here. (See *Vanderpol v. Starr* (2011) 194 Cal.App.4th 385, 389, fn. 2 [123 Cal.Rptr.3d 506].)

[12] Contrary to S.B.'s assertion, the trial court did not "waive" the requirement that S.Y. openly hold out the children as her natural children "because of her second job in the military." As already discussed, the trial court properly concluded that S.Y. satisfied that requirement. With respect to S.Y.'s military service, the court found there were credible explanations "about

those fathers who have entered into some familial relationship with the mother and child and those who have not." (*In re Sabrina H.* (1990) 217 Cal.App.3d 702, 708 [266 Cal.Rptr. 274].) "[T]he premise behind the category of presumed father is that an individual who has demonstrated a commitment to the child and the child's welfare—regardless of whether he is biologically the father—is entitled to the elevated status of presumed fatherhood." (*In re T.R., supra,* 132 Cal.App.4th at pp. 1211–1212.) Here, there is no doubt that S.Y. entered into a familial relationship with S.B. and the children and demonstrated a commitment to the children over the course of their lives. Thus, recognizing S.Y. as a parent furthers the purpose of the statute.

## III

### The Trial Court Did Not Abuse Its Discretion in Determining There Is No Basis to Rebut the Parentage Presumption

S.B. contends "[t]he trial court abused its discretion in finding that [she] had not rebutted any presumption of parenthood which may have arisen under [section] 7611(d)." We disagree.

Section 7612, subdivision (a) provides that "a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence." Thus, S.B. bore the burden below of rebutting the presumption that S.Y. was G.B. and M.B.'s parent with clear and convincing evidence. (*Charisma R., supra,* 175 Cal.App.4th at p. 378.) We review the trial court's determination that S.B. failed to meet her burden for abuse of discretion. (*Elisa B., supra,* 37 Cal.4th at p. 122.)

In *Elisa B.,* the court held that it would be an abuse of discretion to conclude that the presumption may be rebutted "with proof that [Elisa] is not the children's biological mother because [(1)] she actively participated in causing the children to be conceived with the understanding that she would raise the children as her own together with the birth mother, [(2)] she voluntarily accepted the rights and obligations of parenthood after the children were born, and [(3)] there are no competing claims to her being the children's second parent." (*Elisa B., supra,* 37 Cal.4th at p. 125.) The court further concluded that "[d]eclaring that Elisa cannot be the twins' parent and,

---

why the parties did not or felt they could not formalize their relationship or enter into a public or formal adoption," including S.Y.'s belief that doing so would jeopardize her military career. As the court properly noted, formalization of the relationship is not required; rather, it is one factor the court may consider.

thus, has no obligation to support them because she is not biologically related to them would produce a result similar to the situation we sought to avoid in [*In re*] *Nicholas H.* [(2002) 28 Cal.4th 56 [120 Cal.Rptr.2d 146, 46 P.3d 932]] of leaving the child fatherless. . . . Rebutting the presumption that Elisa is the twin[s'] parent would leave them with only one parent and would deprive them of the support of their second parent." (*Id.* at p. 122.)

■ Similarly, here, S.Y. encouraged S.B. to adopt a child with the understanding she would coparent the child; S.Y. voluntarily accepted the rights and obligations of parenthood since the children were born; there are no competing claims to her being the children's second parent; and public policy favors children having two parents. (See *Elisa B., supra*, 37 Cal.4th at pp. 120, 122.) The trial court acted well within its discretion in concluding S.B. failed to rebut the parentage presumption.

IV

Recognizing S.Y. as a Parent Did Not Infringe upon S.B.'s
Fundamental Right to Rear Her Children

Citing *Troxel v. Granville* (2000) 530 U.S. 57 [147 L.Ed.2d 49, 120 S.Ct. 2054], S.B. claims that the trial court's order declaring that S.Y. is a parent of G.B. and M.B. violated her right, under the due process clause of the Fourteenth Amendment of the United States Constitution, to make decisions concerning the care, custody, and control of her children. She is mistaken.

In *Troxel*, the court held that a Washington statute that allowed " 'any person [to] petition the court for visitation rights at any time' " and authorized the court "to grant such visitation rights whenever 'visitation may serve the best interest of the child,' " as applied in that case, infringed upon the mother's fundamental right to make decisions concerning the care, custody, and control of her children. (*Troxel v. Granville, supra*, 530 U.S. at pp. 67, 60 [147 L.Ed.2d at pp. 57, 53], italics omitted.) Under the statute, the mother was required to permit her children's paternal grandparents to visit the children on a schedule imposed by the trial court. (530 U.S. at pp. 71–72 [147 L.Ed.2d at pp. 60–61].)

*Troxel* is inapposite where, as here, the issue is not a nonparental visitation statute, but "a statute determining the identity of [G.B. and M.B.'s] parents. Unlike the order in *Troxel*, the order declaring [S.Y.] a parent of [G.B. and M.B.] by definition did not extend rights to a nonparent." (*Charisma R., supra*, 175 Cal.App.4th at p. 387.)

S.B. attempts to distinguish *Charisma R.* on factual grounds, arguing that in that case the court relied on the fact that "neither Charisma's nor Kristina's

'claim to parentage preceded the other's.' " (*Charisma R., supra,* 175 Cal.App.4th at p. 387.) S.B., however, fails to cite to any authority in support of her assertion that "[p]arentage must arise simultaneously." Moreover, the seminal case for applying section 7611(d) to a nonbiological parent is *In re Nicholas H.,* where parentage most certainly did not "arise simultaneously," because the man seeking presumed father status did not even know the mother when the child was conceived. (*In re Nicholas H, supra,* 28 Cal.4th at p. 61.)

Contrary to S.B.'s assertion, *Charisma R.* does not hold that parental rights must arise simultaneously to receive equal constitutional protection. In *K.M. v. E.G.* (2005) 37 Cal.4th 130 [33 Cal.Rptr.3d 61, 117 P.3d 673], upon which *Charisma R.* relies (*Charisma R., supra,* 175 Cal.App.4th at p. 387), an egg donor (K.M.) sought to establish a parental relationship with twin girls born to her former lesbian partner. (37 Cal.4th at p. 134.) In response to Justice Werdegar's dissent, which cited *Troxel* for the proposition that " 'We cannot recognize K.M. as a parent without diminishing E.G.'s *existing* parental rights[,]' ([d]is. opn. of Werdegar, J., *post,* at p. 153 [italics added])," the majority stated: "*Troxel* has no application here. Neither K.M.'s nor E.G.'s claim to parentage preceded the other's. K.M.'s claim to be the twins' mother because the twins were produced from her ova is equal to, and arose at the same time as, E.G.'s claim to be the twins' mother because she gave birth to them." (*Id.* at p. 144.) The fact that K.M.'s and E. G.'s parentage claims arose simultaneously was relevant to Justice Werdegar's assertion that recognizing K.M. as a parent would diminish E.G.'s *existing* parental rights. If the women's rights arose at the same time, recognizing K.M. as a parent necessarily could not diminish E.G.'s existing parental rights. The court's comments cannot be read to mean that *Troxel* would apply if K.M.'s claim to be the twins' mother arose after E.G.'s because, as noted above, *Troxel* did not involve parentage, but rather, visitation by nonparents.

In *Charisma R.,* a biological mother, relying on *Troxel,* argued that "the trial court's ruling, declaring [her former lesbian partner] Charisma a presumed parent 'over [the biological mother's] objections . . .' violated . . . her fundamental parental right to rear [her child]." (*Charisma R., supra,* 175 Cal.App.4th at p. 386.) In holding that *Troxel* was inapposite, the court noted that "[u]nlike the order in *Troxel,* the order declaring Charisma a parent of Amalia by definition did not extend rights to a nonparent." (*Id.* at p. 387.) The court continued, "Moreover, as in *K.M. v. E.G.* . . . , neither Charisma's nor [the biological mother's] 'claim to parentage preceded the other's.' In that case, the California Supreme Court rejected an analogy to *Troxel,* reasoning 'K.M.'s claim to be the twins' mother because the twins were produced from

her ova is equal to, and arose at the same time as, E.G.'s claim to be the twins' mother because she gave birth to them.' " (*Ibid.*) To the extent *Charisma R.* suggests that parental rights arise simultaneously to receive equal constitutional protection, as S.B. appears to assert, we respectfully disagree with the court on that point because *Troxel* did not involve a parentage claim, and thus, the court did not have occasion to address the significance, if any, of when the parties' respective parental rights arose.

In any case, S.B.'s argument that parentage must arise simultaneously is dependent upon an analysis of contested facts, which must be construed in S.Y.'s favor. The trial court found that S.Y. accompanied S.B. to Redding for G.B.'s birth and was involved in his life from that day forward. The court further found that although S.B. was not present when M.B. was born, "after M.B. came home, [S.Y.] again stepped up and supported the child thereafter and co-parented the child with [S.B.]" Substantial evidence supports the court's findings.

Finally, we reject S.B.'s claim that "a woman's right to assert visitation rights—much less parental rights—to her former partner's children, is not widely protected by society even today." As S.Y. points out in her respondent's brief, numerous states have recognized the parental rights of same-sex coparents who do not have a biological or adoptive relationship with a child. (See, e.g., *Thomas v. Thomas* (2002) 203 Ariz. 34 [49 P.3d 306, 309]; *In re E.L.M.C.* (Colo.Ct.App. 2004) 100 P.3d 546, 555–556; *Laspina-Williams v. Laspina-Williams* (1999) 46 Conn.Supp. 165 [742 A.2d 840, 844]; *In re Parentage of A.B.* (Ind. 2005) 837 N.E.2d 965, 967; *C.E.W. v. D.E.W.* (2004) 2004 ME 43 [845 A.2d 1146, 1149]; *E.N.O. v. L.M.M.* (1999) 429 Mass. 824 [711 N.E.2d 886, 888]; *SooHoo v. Johnson* (Minn. 2007) 731 N.W.2d 815, 824; *Kulstad v. Maniaci* (2009) 352 Mont. 513 [220 P.3d 595, 607, 610]; *Russell v. Bridgens* (2002) 264 Neb. 217 [647 N.W.2d 56, 65–66] (conc. opn. of Gerrard, J.); *Mason v. Dwinnell* (2008) 190 N.C.App. 209 [660 S.E.2d 58, 67–69]; *V.C. v. M.J.B.* (2000) 163 N.J. 200 [748 A.2d 539, 551–552]; *In re Bonfield* (2002) 97 Ohio St.3d 387 [780 N.E.2d 241, 247]; *Shineovich v. Kemp* (2009) 229 Ore.App. 670 [214 P.3d 29, 40]; *T.B. v. L.R.M.* (2001) 567 Pa. 222 [786 A.2d 913, 914]; *Rubano v. DiCenzo* (R.I. 2000) 759 A.2d 959, 974–975; *Middleton v. Johnson* (Ct.App. 2006) 369 S.C. 585 [633 S.E.2d 162, 167–168]; *In re Parentage of L.B.* (2005) 155 Wn.2d 679 [122 P.3d 161, 173–176]; *In re Clifford K.* (2005) 217 W.Va. 625 [619 S.E.2d 138, 157–159]; *In re Custody of H.S.H.-K.* (1995) 193 Wis.2d 649 [533 N.W.2d 419, 435–436].)

## DISPOSITION

The judgment is affirmed. S.Y. shall recover her costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1).)

Nicholson, J., and Hoch, J., concurred.

A petition for a rehearing was denied January 5, 2012, and appellant's petition for review by the Supreme Court was denied February 29, 2012, S199507.