Filed 2/27/23  L.V. v. E.C. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| L.V., | D080046 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 20FL005185C) |
| E.C. et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of San Diego County, Jinsook Ohta, Judge.  Affirmed.

Cage & Miles and John T. Sylvester for Plaintiff and Appellant.

Bickford Blado & Botros and Andrew J. Botros for Defendants and Respondents.

Plaintiff and appellant L.V. appeals a family court judgment denying her petition to be determined a third parent to her granddaughter, A.C. under Family Code section 7612, subdivision (c).[1]  The court based its ruling

---

[1]     All further statutory references are to the Family Code unless otherwise specified.

on its conclusion that L.V. failed to establish presumed parent status of A.C. under section 7611, subdivision (d), because L.V. had not demonstrated that she openly held A.C. out as her own. L.V. does not bring a substantial evidence challenge to the court's finding. Instead, L.V. contends the court committed reversible error when it applied what L.V. calls an "antiquated" approach to the requirement that she "openly hold out" A.C. as her natural child. According to L.V., rather than requiring her to "pretend [A.C.] was her own natural child in her community, modern authority holds the statute requires her to *treat* [A.C.] as her child by committing herself to parental responsibilities." L.V. argues her commitment to parenting A.C. was undisputed and the trial court therefore abused its discretion in finding she failed to hold out A.C. as her own.

We conclude the court correctly interpreted and applied section 7611, subdivision (d)'s holding out requirement. While L.V. argues a party seeking presumed status can admit and acknowledge she is not a biological parent without losing presumed status, performance of parental responsibilities alone does not entitle a person to presumed parent status. The ultimate issues are whether the party seeking presumed status demonstrated a commitment to the child and established a fully developed *parental* relationship.

Contrary to L.V.'s argument on appeal, the trial court did not rely solely on whether L.V. publicly declared A.C. as her own. Rather, the court concluded L.V. was a caring grandmother who performed many parental duties and had a deep and loving grandparent bond with A.C., but failed to establish a *parental* relationship with A.C. The judgment is affirmed.

2

## FACTUAL AND PROCEDURAL BACKGROUND

L.V. filed a petition to be determined a parent of A.C. under section 7611, subdivision (d), on the basis that she received A.C. into her home and openly held out A.C. as her natural child.

In support of her petition, L.V. alleged that A.C.'s mother E.C. (Mother) and father J.C. (Father) did not care for A.C. for the first five years of life. L.V. declared that as soon as A.C. was born in October 2014, she began caring for A.C. four days per week. The evidence showed that when Mother and Father began to have problems in April 2016, Mother and A.C. moved in with L.V. and her husband. Mother and A.C. moved back in with Father in September 2016 until Mother and Father separated in June 2017. During this time, L.V. helped care for A.C. approximately two to three days per week and one or two overnights. Mother and A.C. moved back in with L.V. from June 2017 to December 2018. Mother and A.C. lived on their own in a rental from December 2018 to May 2019. They moved back in with L.V. until November 2019, at which time Mother remarried and moved herself and A.C. in with her new husband, D.S. In January 2020, Mother and Father decided to end L.V.'s contact with A.C.

L.V. testified that her bond with A.C. was a "very strong, loving, mother-daughter bond, grandmother. I'm both to [A.C.]" She did not tell A.C. that she was her mother because A.C. was autistic and telling A.C. that she was no longer her grandmother would have "devastated her." L.V. introduced herself to A.C.'s teachers as A.C.'s grandmother and never introduced herself as A.C.'s parent. She also referred to herself as A.C.'s grandmother on her public Facebook posts. However, she testified that she would call A.C. "mija," which means "my daughter" in Spanish. She testified A.C. called her "Mama Two, Grandma." According to L.V., Mother

3

acknowledged that L.V. was A.C.'s mother in one text, which read "Great team work, [A.C.'s] mom." Mother testified that she never intentionally referred to L.V. as A.C.'s mom and the text was a typo where she meant to say "Great team work with [A.C.], mom."

L.V. claimed she co-parented A.C. with Mother and Father. She picked up and dropped off A.C. at school and brought A.C. to see doctors, which L.V. characterized as "parental duties," but testified that she did these at Mother's behest. Mother also set the schedule for when L.V. would watch A.C. L.V. testified that she never attended A.C.'s back to school nights, Individualized Education Plan (IEP) meetings, or parent-teacher conferences.

L.V.'s husband testified that while Mother and A.C. were living with them, L.V. dressed and fed A.C., took her to and picked her up from school, woke her up in the morning, and put her to bed at night. He testified L.V. developed strategies to encourage A.C.'s developmental growth and that they had a "really unique, special bond." He testified that in public, people would comment as if A.C. was L.V.'s daughter. However, he had never heard A.C. call L.V. "Mama Two."

Mother's sister, L.S. testified that she did hear A.C. refer to L.V. as "Mama Two." She never heard L.V. refer to A.C. as her child but she did hear L.V. call A.C. "mija," which L.S. explained is Spanish for "my daughter." She testified A.C. and L.V. had a "deep and beautiful bond" and L.V. "would play every aspect of the role of mother because she was a mother to [A.C.]"

Mother testified she never heard A.C. call L.V. "Mommy," "Mom," or "Mama Two," or otherwise refer to L.V. as her mother. She had also never heard L.V. refer to A.C. as her child or daughter. She acknowledged L.V. would sometimes call A.C. "mija," and testified that L.V. would call other people "mija," including younger cousins. Mother testified this is a slang

4

word used in Hispanic culture that she has never interpreted to mean child. No family members referred to L.V. as A.C.'s mother or A.C. as L.V.'s child.

Mother testified that L.V. did not have any influence or involvement in schooling decisions for A.C., and L.V. did not attend school events for parents. Mother testified she took A.C. to the majority of her medical appointments, with occasional help from L.V. or Father. Mother denied that she and L.V. coparented A.C., but admitted they had a "system-like arrangement." Mother acknowledged that L.V. gave her money two to three times a month, which she understood to be reimbursements for groceries and money that L.V. borrowed from her, not child support.

Father testified he never heard A.C. call L.V. "Mommy," "Mom," or "Mommy Two," and had never heard L.V. refer to A.C. as her daughter. Other family members including Mother's second husband D.S., Father's father (A.C.'s paternal grandfather), L.V.'s brother's wife (L.V.'s sister-in-law), L.V.'s brother's daughter (L.V.'s niece), and L.V.'s son (Mother's brother) testified that L.V. did not call A.C. her daughter, nor did A.C. refer to L.V. as her mother, and they understood that L.V. was A.C.'s grandmother, not Mother.

Mother and Father both testified that A.C. had not asked about L.V. since they "cut off" contact in January 2020.

The court issued a statement of decision concluding: "The evidence establishes that [L.V.] was a doting grandmother and, like many other grandmothers, generously assisted in the rearing of her grandchild. Despite her deep and loving grandparent bond with [A.C.], the court concludes that she did not assume a parental relationship with [A.C.] such that she could be deemed to have openly held out [A.C.] as her child." The court noted the requirement that a party seeking presumed parent status prove that she

5

openly held out the child as her natural child "looks at the extent and nature of the claimed parental relationship; it does not require that the person seeking parental status to have represented that the child is their biological child." Citing *In re Bryan D.* (2011) 199 Cal.App.4th 127, 139-140 (*Bryan D.*), the court stated that "[i]n the context of a grandparent-grandchild biological relationship . . . the 'holding out' prong requires more than the performance of 'all parental responsibilities.' "

Under a subheading titled "[L.V.'s] bond with her grandchild," the court acknowledged credible evidence of the close bond between L.V. and A.C. as well as "undisputed testimony" that L.V. shared in the child rearing duties during the times that A.C. was living with her. The court stated "[n]o one disputes that [L.V.] was a loving and involved grandmother who played a significant role in [A.C.'s] life." However, the evidence "failed to establish by a preponderance, that the relationship exceeded a close and special grandparent-grandchild bond and became a parental relationship." Under this subheading, the court found the testimony that A.C. called L.V. " 'Momma [Two]' " lacked credibility given testimony about A.C.'s verbal abilities due to her autism. The court also rejected L.V.'s contention that Mother referred to her as " 'Aria mom,' " and found that the testimony applying "mija" as a literal declaration that A.C. was L.V.'s daughter lacked credibility.

Under a subheading titled "The extent of [L.V.'s] assumption of parental responsibilities," the court acknowledged that L.V. performed many parental duties for A.C., and stated "that alone does not create a parental relationship, any more than being a nanny creates a parental relationship." The court noted L.V. cared for A.C. at Mother's request and permission, and occasionally obtained medical care for A.C. with the knowledge and at the

6

direction of Mother.  Also, while L.V. did much of the driving to school for A.C., Mother "executed parental responsibilities" such as enrolling A.C. in school, attending IEP sessions, and attending parent-teacher conferences and school events for parents.  The court concluded "Mother received significant childcare help from [L.V.] but acted as the primary parent for [A.C.] at all times."

Under a subheading titled "Friends, relatives, and school staff understood [L.V.] to be [A.C.'s] grandmother rather than de facto parent," the court stated "[n]ot surprisingly, the general perception of the people's in [L.V.'s] and [A.C.'s] community matched the underlying reality of their grandparent-grandchild relationship."  The court noted L.V. posted public social media communications referring to A.C. as her granddaughter and Mother as A.C.'s mother, and L.V. presented no evidence regarding any communications in which she discusses her role as A.C.'s parent.  Additionally, L.V.'s close relatives understood she was a grandparent to A.C. rather than a grandmother raising A.C. as her own child, which the court weighed more heavily than L.V.'s testimony that she did not correct strangers when they assumed A.C. was her daughter.  The court also noted teachers and staff at A.C.'s schools understood L.V. to be a grandmother assisting in pickups rather than a person playing the role of a parent in A.C.'s life.

## DISCUSSION

As identified by L.V., the sole issue in this appeal is whether the court erred in its interpretation of section 7611, subdivision (d)'s "holding out" requirement.  Review of the trial court's legal interpretation of the statute is

7

subject to de novo review.[2] (*S.Y. v. S.B.* (2011) 201 Cal.App.4th 1023, 1031 (*S.Y.*).)

Section 7611, subdivision (d) provides that a person is presumed to be the natural parent of a child if "[t]he presumed parent receives the child into their home and openly holds out the child as their natural child."

According to L.V., there is an "antiquated" approach to the holding out standard, which requires a public display of admitted parentage. She contends this view wrongly denies presumed parent status to those who demonstrate a parent-child bond, despite publicly acknowledging a different biological reality. L.V. refers to the "modern" approach to the holding out requirement as one that emphasizes "parentage in action, rather than words," focusing on commitment to the child even if the person does not publicly claim or pretend to be the child's biological parent.

L.V. argues the court erred in applying the "antiquated" approach by relying solely on her failure to publicly claim A.C. as her own child. She further contends she satisfied the modern approach when she undertook significant parental responsibilities for A.C. L.V. argues that under the modern application of the holding out requirement, the court abused its discretion in finding that she did not hold out A.C. as her own because it was undisputed that she shared in child-rearing duties and was committed to parenting A.C.

---

2 The court's factual finding that L.V. did not hold out A.C. as her natural child is subject to the substantial evidence standard of review. (*S.Y., supra*, 201 Cal.App.4th at p. 1031.) L.V., however, does not contend that there is a lack of substantial evidence to support the court's finding and instead challenges only the court's legal interpretation of the holding out requirement.

As an initial matter, we disagree that there is an "antiquated" approach to the holding out requirement that focuses on a public display of admitted parentage. Citing *Adoption of Michael H.* (1995) 10 Cal.4th 1043, *Adoption of Kelsey S.* (1992) 1 Cal.4th 816, and *In re Spencer W.* (1996) 48 Cal.App.4th 1647 (*Spencer W.*), L.V. argues that the "antiquated" approach to the holding out requirement derives from antiquated notions of legitimacy and paternity, and focused on unwed biological fathers' words and the community's perception of those words. According to L.V., by openly and publicly admitting paternity, the father could establish their willingness to assume full responsibility for the child. These cases did involve an unwed biological father's claim to his child, however, *Michael H.* and *Kelsey S.* did not analyze presumed father status under section 7611, subdivision (d)'s holding out requirement. In *Michael H.*, the trial court determined that the father was not a presumed father under section 7611 and the father did not challenge that conclusion on appeal, instead asserting a constitutional right to his child. (*Michael H.*, at p. 1052.) In *Kelsey S.*, it was undisputed that the father openly held out the child as being his own, but he was not a presumed father because he did not physically receive the child into his home. (*Kelsey S.*, at p. 825.)

In *Spencer W.*, the court concluded that the father's "*actions, as a whole*, were not sufficient to satisfy the requirement that [he] '*openly and publicly* admit paternity.' " (*Spencer W., supra*, 48 Cal.App.4th at pp. 1653-1654, first italics added.) The court noted that the father claimed paternity to his family and friends but was unwilling to claim paternity when there might have been some cost to him, and the father failed to take steps to place his name on the birth certificate or establish paternity by legal action. However, in analyzing the "holding out" requirement, the court also

9

considered facts such as the father's failure to assume financial obligations for child support, and the father's "indifference toward establishing or maintaining a parental relationship" with the child during the years that the father was in prison. (*Id.* at p. 1654.) The court applied the reasoning that "presumed father status is earned based on a commitment toward developing a 'substantial familial relationship to the child.'" (*Id.* at pp. 1654-1655.) Thus, the court looked beyond the father's words or public acknowledgment of paternity, ultimately considering whether the father showed a commitment to and established a parental relationship with the child.

We also disagree that the "antiquated" approach has been applied as a bar to "prevent willing parental figures from claiming parentage, simply because they recognized the biological reality that they were not, in fact, the child's natural parent." L.V. contends two cases, *In re Jose C.* (2010) 188 Cal.App.4th 147 (*Jose C.*) and *Bryan D.*, were wrongly decided and "suggest the presumed parent should not only have acted like a parent, but publicly pretended to be one, despite knowing this was not the truth." She further contends that this approach, which shifts the focus away from commitment to parental responsibilities, persists in a handful of cases, citing *R.M. v. T.A.* (2015) 233 Cal.App.4th 760 (*R.M.*) and *In re D.A.* (2012) 204 Cal.App.4th 811 (*D.A.*).[3]

We agree that *Jose C.* and *Bryan D.* appear to weigh heavily evidence that the party seeking presumed status did not publicly claim to be the child's parent and that the child and others knew that the party seeking presumed status was not the child's parent. (See *Bryan D., supra,*

_____

[3] L.V. also cited *In re T.G.* (2013) 215 Cal.App.4th 1, however, the trial court's presumed parent finding was not an issue on appeal in that case. (*Id.* at pp. 9, 18.)

10

199 Cal.App.4th at pp. 139-140 ["undisputed that grandmother performed all parental responsibilities for him. However, there was no evidence that grandmother was openly holding Bryan out as her *son*, rather than as her grandson. Both grandmother and Bryan indicated that grandmother was like a mother, or acted as his mother. But in all of the interviews of Bryan, he referred to grandmother as his grandmother, not his mother. . . . [¶] . . . Even if Bryan at some point believed grandmother was his mother, this was no longer true, and had not been true for years"]; *Jose C., supra*, 188 Cal.App.4th at pp. 162-163 ["grandfather acted as the functional equivalent of Jose's father . . . but that alone does not satisfy the test for presumed father status. . . . [¶] . . . Jose (and everyone else) knows he is not grandfather's son, and grandfather has never suggested to anyone that he is Jose's father. Consequently, grandfather cannot qualify as a presumed father"].)

We do not agree, however, that *Jose C.* and *Bryan D.* suggest that the determining factor is whether the party seeking presumed status publicly claimed to be the child's parent in the face of a different biological parentage. Rather, this reflects the reality that there is a difference between a grandparent performing parental responsibilities as a grandparent versus as a parent—i.e., whether the grandparent established a *parental* relationship. (*See Jose C., supra*, 188 Cal.App.4th at p. 162 ["Many people may perform the function of a parent at various points in a child's life, including grandparents, stepparents, foster parents, extended family members, and so on. Doing so does not make any of them a presumed parent"].) Whether the party seeking presumed status publicly claims to be the child's parent, and whether the child and the community perceive the party seeking presumed status to be the child's parent are facts that courts properly consider in assessing the

distinction.  This is further demonstrated by the cases that L.V. claims perpetuate *Jose C.*'s and *Bryan D.*'s approach.

In *R.M.*, the court stated, "[w]hen determining whether the person has met the statutory requirements of receiving the child into his or her home and openly holding the child out as his or her own, the court may consider a wide variety of factors, including the person's provision of physical and/or financial support for the child, efforts to place the person's name on the birth certificate, efforts to seek legal custody, and the breadth and unequivocal nature of the person's acknowledgement of the child as his or her own. [Citation.]  No single factor is determinative; rather, the court may consider all the circumstances *when deciding whether the person demonstrated a parental relationship* by holding out the child as his or her own and assuming responsibility for the child by receiving the child into his or her home." (*R.M., supra*, 233 Cal.App.4th at p. 774, italics added.)  In affirming the trial court's finding that R.M. was the child's presumed father, the court considered the fact that R.M. and the mother openly referred to the child as R.M.'s daughter, which was corroborated by R.M.'s brother, pastor, and neighbor. (*Id.* at p. 781).  The court also considered facts beyond any party's verbal acknowledgment of R.M.'s relationship with the child, such as the fact that R.M. was at the hospital assisting the mother when the child was born, R.M., the mother, and the child participated in family events and recreational outings, and attended church together as a family unit, and R.M. named the child as his beneficiary on his life insurance policy. (*Id.* at pp. 780-781.)  The court concluded that "all this evidence together" supports a finding that R.M., the mother, the child, and the community at large "all perceived the relationship between RM and Child as a father-daughter relationship." (*Id.* at p. 781.)

The court in *D.A.* concluded the record contained no evidence that the party seeking presumed father status met the requirements of receiving the child into his home and openly holding the child out as his natural child. (*D.A., supra*, 204 Cal.App.4th at p. 814.) The court reasoned that the appearance of his name on the child's birth certificate did not constitute evidence that he openly and publicly admitted paternity because he did not sign the birth certificate. (*Id.* at p. 827.) That does not mean, however, that the court considered a public claim of paternity to be the determining factor. Rather, the unsigned birth certificate did not constitute evidence that could satisfy the holding out requirement and the record contained no other evidence that could satisfy the requirement. Notably, the party seeking presumed status moved in with the mother just two weeks before and moved out two weeks after the child was born. After he moved out and before the child was detained at six months old, he watched the child overnight on some unspecified number of occasions while the mother "was out partying." (*Ibid.*) Thus, it appears there was simply no evidence of a fully developed parental relationship.

Just as we disagree that there is an "antiquated" approach to the holding out requirement, we disagree that there is a "modern" approach. According to L.V., the "modern" approach emphasizes parentage in action, rather than words, focusing on commitment to the child even if the person does not publicly claim or pretend to be the child's biological parent. As explained above, the cases that L.V. cites as applying an "antiquated" approach do not treat public claims of parentage as determinative, but rather as a fact to be considered, along with other facts. The cases that L.V. cites as applying a "modern" approach still consider public claims of parentage as a relevant fact, as well as other facts. (See *In re T.R.* (2005) 132 Cal.App.4th

13

1202, 1211 [presumed father applicant openly acknowledged T.R. as his daughter, provided financial support, and received her in his home; however, these positive factors were outweighed by conduct antithetical to a parent's role]; *In re Nicholas H.* (2002) 28 Cal.4th 56, 61 [in concluding the evidence more than satisfied the requirements of section 7611, subdivision (d), the Court of Appeal observed the party seeking presumed status provided Nicholas with significant financial support over the years, consistently referred to and treated Nicholas as his son, was the " 'only father Nicholas has ever know[n],' " and Nicholas had " 'a strong emotional bond' " with him; issue considered by California Supreme Court was whether under section 7612, subdivision (a), a man loses this status as a presumed father by admitting he is not the biological father]; *Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 122 [the party seeking presumed parent status acted as a coparent with the biological mother for a substantial period of time, gave the children at issue and her biological child the same surname, breast-fed the children, claimed the children as her dependents on her tax returns, and testified that she considered herself to be the children's mother]; *In re M.R.* (2017) 7 Cal.App.5th 886, 899 [the presumed father always viewed the child as his son and always held him out as such to others, the child was treated as part of the presumed father's family not only by him but also his wife and extended family, and the child viewed him as his father]; *S.Y., supra,* 201 Cal.App.4th at p. 1034 [concluding that S.Y. was the presumed parent of the children that her former same-sex partner, S.B. adopted, the court considered that S.Y. helped care for the children since birth, displayed pictures of S.B. and the children at work for everyone to see, brought S.B. and the children to work-related functions typically attended by family, attended school events, baseball games, and practices, named the children as

14

beneficiaries on everything she had, went on family vacations with S.B. and the children; also S.Y.'s parents considered and treated the children as their grandchildren, and S.B. and the children gave S.Y. Mother's Day cards]; *In re Alexander P.* (2016) 4 Cal.App.5th 475, 493 [the presumed father acted as the child's live-in father, taking on the various duties and responsibilities demanded of an infant's parent, the presumed father treated the child as his own child and the child referred to him as "Daddy," the child was most comfortable in the presumed father's care, and the presumed father reaffirmed his commitment to return to the mother and the minor on a permanent basis].)

While L.V. contends that the "modern" approach focuses on commitment to the child by performing parental responsibilities, that fact is not determinative either.  That is, even if the person seeking presumed status demonstrates a commitment to the child, that person is not necessarily entitled to presumed status if that person does not have a fully developed parental relationship with the child.  (*In re D.M.* (2012) 210 Cal.App.4th 541, 544, 555 ["although J.J. may have done everything he could under the circumstances to be a father to D.M., he must also demonstrate that he has an existing familial bond with the child sufficient to warrant giving him rights equal to those afforded a biological mother"; "the court did not find that there was an existing father-son relationship between J.J. and D.M., without which J.J. cannot be a presumed father"].)  Along the same lines, while it is true that a person can be a presumed parent of a child while acknowledging a different biological reality, performing parental responsibilities alone does not entitle a person to presumed parent status.

In sum, there are no distinct antiquated or modern approaches to the holding out requirement.  Instead, courts consider a wide range of factors as

appropriate to the circumstances including whether the party seeking presumed status publicly claimed to be the child's parent, how the community perceived the relationship, assumption of parental responsibilities, and the parent-child bond. All these factors are informative to the ultimate determination, which is whether the party seeking presumed status demonstrated a commitment to the child and established a fully developed *parental* relationship.

On appeal, L.V. argues that she met the holding out requirement, focusing only on the facts showing that she undertook significant parental responsibilities for A.C. and therefore demonstrated a commitment to A.C. However, more is required to obtain presumed parent status. Particularly lacking here was a fully developed *parental* relationship, as the trial court noted multiple times in its statement of decision.

Contrary to L.V.'s characterization of the court's ruling, the court did not rely solely on L.V.'s failure to publicly claim that A.C. was her child. Rather, it was one fact the court considered in weighing L.V.'s request for presumed parent status. The court also considered L.V.'s bond with A.C., the community's perception of the relationship, and L.V.'s assumption of parental responsibilities. For example, the trial court considered "credible evidence of the close bond between [A.C.] and her grandmother," but found that the evidence "failed to establish by a preponderance, that the relationship exceeded a close and special grandparent–grandchild bond and became a parental relationship." Whether A.C. or Mother called or referred to L.V. as some form of "Mom," and whether L.V. called A.C. her daughter was informative, but not determinative in making this distinction. Likewise, the community's "general perception" of A.C.'s and L.V.'s relationship was not determinative but rather "matched the underlying reality of their

16

grandparent-grandchild relationship." The fact that L.V. referred to A.C. as her granddaughter on public social media posts was again indicative of the relationship, but not determinative. The court also acknowledged that L.V. performed many parental duties but correctly noted that "that alone does not create a parental relationship, any more than being a nanny creates a parental relationship." We find no abuse of discretion in the court's consideration of all of these factors in concluding that L.V. "did not assume a parental relationship with [A.C.] such that she could be deemed to have openly held out [A.C.] as her child."

We also disagree with L.V.'s contention that she would have satisfied the holding out requirement if she had simply pretended to be A.C.'s biological parent in public. We note an important distinction here, that whether the party seeking presumed status pretends to be or claims to be the child's biological parent, or whether the community believes that the party seeking presumed status is actually the child's biological parent are not the relevant facts. Rather, it is how the parties and the community perceive the relationship that is relevant. (See *S.Y., supra*, 201 Cal.App.4th at pp. 1028-1029 ["Although S.Y. referred to herself as the children's 'godparent,' her supervisor understood 'she was in her role as the parent' "].) This makes sense because where a person is so committed to a child and has developed a parental relationship with the child such that people perceive or consider the person to be the child's parent even though they know the person is not actually the child's biological parent, that matters more than a verbal claim of being the child's biological parent. Said another way, whether the party seeking presumed parent status makes public claims of being the child's parent, and whether the community perceives the person to be the child's

17

parent is indicative (again, not determinative) of a fully developed parental relationship.

DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.