[No. D060409. Fourth Dist., Div. One. Aug. 2, 2012.]

L.M., Plaintiff and Respondent, v.
M.G., Defendant and Appellant.

**COUNSEL**

Stephen Temko, Jeffrey W. Doeringer and David Lee Moore for Defendant and Appellant.

Sandler, Lasry, Laube, Byer & Valdez and Edward I. Silverman for Plaintiff and Respondent.

**OPINION**

**IRION, J.**—M.G. challenges the trial court's judgment under the Uniform Parentage Act (UPA) (Fam. Code, § 7600 et seq.)[1] that M.G.'s former same-sex partner, L.M., is a second parent to the child that M.G. adopted during their relationship (the Child). Based on various statutory arguments, M.G. contends that L.M. may not be determined to be the Child's second parent because M.G. obtained her parental status through a single parent adoption decree, which, according to M.G., should bar any person from being determined to be the Child's second parent. As we will explain, we conclude that M.G.'s arguments are without merit and, accordingly, we affirm the judgment.

I

FACTUAL AND PROCEDURAL BACKGROUND

M.G. and L.M., who are both women, lived together as same-sex partners from 1998 to the end of 2003, but were not registered domestic partners. (§ 297 et seq.) Their household included M.G.'s son, born in 1992, and L.M.'s daughter, born in the mid-1980's.

---

[1] Unless otherwise indicated, all further statutory references are to the Family Code.

M.G. desired to have another child, and during her relationship with L.M., M.G. unsuccessfully attempted to conceive a child through artificial insemination with the same sperm donor she used for her son in 1992. According to L.M., she suggested that M.G. consider adoption. As L.M. testified, "We were a couple at the time, and we were a family, and we talked about having a third child in our life."

In 2000, M.G. learned of an opportunity to adopt a child from a pregnant woman in Tijuana, Mexico, who wanted to place her child for adoption when it was born. M.G. met with the birth mother several times in Mexico and agreed to an adoption. After the initial meeting, L.M. accompanied M.G. to at least one of the successive meetings with the birth mother. To avoid the complexity of an international adoption, M.G. arranged for the birth mother to move to California to give birth and paid for the birth mother's living and medical expenses.

The Child was born in November 2000 and came to live in the household with M.G. and L.M. M.G. took maternity leave from work for the Child's first three weeks of life, and according to L.M., she took leave from work to care for the Child during the next three weeks. M.G. and L.M. both participated in caring for the Child in their household.

M.G. formally adopted the Child in October 2001 by obtaining an adoption decree from the court. L.M. was present at the adoption hearing. According to L.M., at the time of M.G.'s adoption of the Child the plan was for the couple to register as domestic partners, followed by L.M.'s eventual adoption of the Child in a stepparent adoption. (See § 9000.)[2]

---

[2] We note that the amendment to section 9000, which permitted stepparent adoption for registered domestic partners, became law just days before the adoption of the Child in late October 2001. (Stats. 2001, ch. 893, § 5, p. 7286, approved by Governor and filed with Sect. of State, Oct. 14, 2001.) The parties did not develop the record on the issue of whether it would have been possible for M.G. and L.M., as a same-sex couple, to *jointly* and *simultaneously* adopt the Child in October 2001 had they desired to do so rather than planning on a subsequent stepparent adoption after becoming registered domestic partners. We note that it was not until 2003 that our Supreme Court approved the procedure of second parent adoptions for lesbian couples when the child was conceived through artificial insemination by one of the women (*Sharon S. v. Superior Court* (2003) 31 Cal.4th 417 [2 Cal.Rptr.3d 699, 73 P.3d 554]), and Justice Baxter's opinion in that case discusses the fact that until November 1999, with a brief exception, the State Department of Social Services, which investigates and makes recommendations on proposed independent adoptions (§§ 8806, 8807), "maintained a policy of opposing 'any petition for adoption in which a child is to be adopted into an unmarried couple.'" (*Sharon S.*, at p. 448 (conc. & dis. opn. of Baxter, J.).) According to L.M.'s testimony, at the time of the Child's adoption in 2001 she believed that stepparent adoption by a registered domestic partner "was the only legal pathway at that point" to adoption by a same-sex couple, and she understood that M.G. was the only person identified as a parent on the adoption decree because "that's the only way it could be issued at the time."

The couple's relationship ended in 2003 when the Child was a little over three years old. According to L.M., part of the reason the relationship ended was that M.G. would not agree to enter into a domestic partnership with L.M. so that L.M. could participate in a stepparent adoption of the Child. L.M. testified that she consistently asked for M.G. to cooperate in obtaining legal recognition of L.M.'s parental relationship with the Child, but M.G. refused to do so.

After L.M. and M.G. ended their relationship, the Child resided primarily with M.G. but regularly spent the night at L.M.'s house several times a month. The Child had his own room in L.M.'s home, and although M.G.'s and L.M.'s testimony differed somewhat as to the number of nights that the Child spent with L.M., it appears that at least as the Child grew older, he generally spent one weekday night and one weekend night with L.M. on a weekly basis. In addition the Child regularly traveled on vacations with L.M., and L.M. cared for the Child when M.G. was out of town.

The Child calls L.M. by the name "mom" or "mommy," and L.M. refers to the Child as her son. L.M.'s friends and coworkers and the parents at the Child's school understand the Child to be L.M.'s son.

L.M. testified that although she regarded herself as the Child's second mother, she did not file a petition to determine her parentage of the Child for several years after breaking up with M.G. in 2003 because (1) lawyers at the time advised her of the lack of legal precedent regarding parentage determinations in the case of a same-sex couple and (2) M.G. was allowing contact with the Child, and she did not want to risk angering M.G., who might retaliate by cutting off her contact with the Child. According to M.G., she allowed regular contact between L.M. and the Child after her relationship with L.M. ended because the Child had lived in the same house with L.M. since his birth and "knew and loved her." As M.G. explained, "The more people that love you the better. [L.M.] loves him. . . . He's been given a gift. . . . I can't just take it away. It would be wrong."

In October 2009, M.G. informed L.M. that she planned to relocate to Europe with the Child for 18 months beginning in July 2010 because M.G.'s registered domestic partner would be temporarily assigned there for her job. L.M. believed that the extended relocation to Europe was not in the Child's best interest. On May 3, 2010, when the Child was nine years old and shortly before the scheduled trip to Europe, L.M. filed a petition to establish a parental relationship with the Child pursuant to the UPA. She also sought custody and visitation orders, including a determination of whether the relocation to Europe should take place.

M.G. filed a motion to quash the petition and to dismiss the proceedings, or in the alternative to lift the standard family law restraining orders to allow the trip to Europe, pending adjudication of parental status. The trial court denied the motion to quash and the motion to set aside the standard family law restraining orders. M.G. filed a response to the petition on June 28, 2010, and the trial court held a show cause hearing on July 29, 2010, and August 5 and 6, 2010.

In its statement of decision, the trial court adjudged L.M. to be a parent of the Child, finding that L.M. satisfied the requirements of the parentage presumption set forth in section 7611, subdivision (d) because she received the Child into her home and held him out to the world as her natural child. Citing authority that, in the context of a same-sex partnership, a child may have two mothers, the trial court rejected M.G.'s legal argument that there were conflicting parentage claims or presumptions asserted by M.G. and L.M., which the court was required to weigh in order to determine which one prevailed.

The trial court granted joint legal custody to M.G. and L.M. and designated M.G.'s residence as the Child's primary residence. The court permitted M.G. to travel to Europe with the Child for the 2010–2011 school year, with certain rights of visitation by L.M., and a followup hearing in several months to determine whether the stay in Europe should be extended to the full intended period of 18 months. Judgment was entered on August 18, 2011. M.G. filed a notice of appeal.

II

DISCUSSION

A. *Applicable Legal Framework*

A petition to establish a parental relationship is governed by the UPA, which states that "[a]ny interested person may bring an action to determine the existence or nonexistence of a mother and child relationship." (§ 7650, subd. (a).)

As the issue before us involves an application of the UPA, we first closely review the pertinent statutory provisions of the UPA as well as case law that has developed under the UPA concerning determinations of parentage when a child is jointly raised by a lesbian couple.

The UPA defines the " ' "[p]arent and child relationship" ' as 'the legal relationship existing between a child and the child's natural or adoptive

parents . . . . The term includes the mother and child relationship and the father and child relationship.' (§ 7601.)" *(Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 116 [33 Cal.Rptr.3d 46, 117 P.3d 660] *(Elisa B.*).)

■ Section 7610 provides: "The parent and child relationship may be established as follows: [¶] (a) Between a child and the natural mother, it may be established by proof of her having given birth to the child, or under this part. [¶] (b) Between a child and the natural father, it may be established under this part. [¶] (c) Between a child and an adoptive parent, it may be established by proof of adoption." Section 7611 sets forth several circumstances in which "[a] man is presumed to be the natural father of a child . . ." (§ 7611), including, as relevant here, the presumption set forth in section 7611, subdivision (d), which applies when "[h]e receives the child into his home and openly holds out the child as his natural child" (§ 7611, subd. (d)).

Specifically relevant to the issues presented here are the statutory provisions for rebuttal of a presumption of paternity. According to section 7612, subdivision (a), a presumption of paternity arising "under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence." (§ 7612, subd. (a).) Under section 7612, subdivision (b), "[i]f two or more presumptions arise under Section 7610 or 7611 that conflict with each other, or if a presumption under Section 7611 conflicts with a claim pursuant to Section 7610, the presumption ·which on the facts is founded on the weightier considerations of policy and logic controls." (§ 7612, subd. (b).) Finally, under section 7612, subdivision (c), "[t]he presumption under Section 7611 is rebutted by a judgment establishing paternity of the child by another man." (§ 7612, subd. (c).)

Although sections 7611 and 7612 expressly refer to presumptions of *paternity*, they also apply in many actions to determine *maternity*, as the UPA provides that "[i]nsofar as practicable, the provisions of this part applicable to the father and child relationship apply" in an action to determine a mother and child relationship. (§ 7650, subd. (a).) Thus, when a woman fulfills the requirement of section 7611, subdivision (d) in that "[she] receives the child into [her] home and openly holds out the child as [her] natural child" (§ 7611, subd. (d)), a presumption of maternity arises. *(Elisa B., supra,* 37 Cal.4th at pp. 119–120.) Further, case law establishes that a man or a woman may be determined to have openly held out a child as his or her "natural" child within the meaning of section 7611, subdivision (d), despite an admission that the child is not that person's *biological* child. *(In re Nicholas H.* (2002) 28 Cal.4th 56, 63 [120 Cal.Rptr.2d 146, 46 P.3d 932] *(Nicholas H.*); *Elisa B.,* at p. 120.)

Applying the above legal principles, our Supreme Court determined in *Elisa B.* that a woman (Elisa) was a presumed second mother of twins born to her partner through artificial insemination in a lesbian relationship and raised in the women's joint household until the termination of their relationship. (*Elisa B., supra,* 37 Cal.4th at p. 125.) Elisa's relationship to the twins gave rise to a presumption of parentage under section 7611, subdivision (d) because Elisa received the twins into her home and openly held them out as her natural children. (37 Cal.4th at pp. 120–122.) Further, our Supreme Court determined that it was not an "appropriate action" to rebut the presumption pursuant to section 7612, subdivision (a) with clear and convincing evidence that Elisa was not the twins' biological mother, because Elisa "actively participated in causing the children to be conceived with the understanding that she would raise the children as her own together with the birth mother, she voluntarily accepted the rights and obligations of parenthood after the children were born, and there are no competing claims to her being the children's second parent." (*Elisa B.,* at p. 125.) The court focused on the fact that "[r]ebutting the presumption that Elisa is the twin[s'] parent would leave them with only one parent and would deprive them of the support of their second parent," and it noted that "[b]y recognizing the value of determining paternity, the Legislature implicitly recognized the value of having two parents, rather than one, as a source of both emotional and financial support . . . ." (*Id.* at pp. 122, 123.)[3]

Building on the decision in *Elisa B.,* other cases have addressed parentage determinations with respect to children raised by lesbian couples. (*Charisma R. v. Kristina S.* (2009) 175 Cal.App.4th 361 [96 Cal.Rptr.3d 26] (*Charisma R.*) [lesbian partner of biological mother whose child was conceived by artificial insemination during the relationship, but who lived with child for only seven weeks before the relationship ended, was a presumed mother of the child]; *S.Y. v. S.B.* (2011) 201 Cal.App.4th 1023 [134 Cal.Rptr.3d 1] (*S.Y.*) [lesbian partner of a woman who adopted children during the relationship was a presumed mother of the children]; *E.C. v. J.V.* (2012) 202 Cal.App.4th 1076 [136 Cal.Rptr.3d 339] (*E.C.*) [remanding to trial court to apply proper analysis in determining whether former lesbian partner of a child's biological mother was a presumed parent of the child who was raised by the couple until age five].)

---

[3] On the same day as *Elisa B.,* our Supreme Court decided two companion cases concerning parentage rights to a child born to a partner in a lesbian relationship. (*K.M. v. E.G.* (2005) 37 Cal.4th 130 [33 Cal.Rptr.3d 61, 117 P.3d 673] (*K.M.*) [woman who donated the egg that created the child born to her lesbian partner through in vitro fertilization was a mother by virtue of a genetic relationship and the gestational mother was also a mother by virtue of having given birth]; *Kristine H. v. Lisa R.* (2005) 37 Cal.4th 156 [33 Cal.Rptr.3d 81, 117 P.3d 690] (*Kristine H.*) [a woman was the parent of a child born to her lesbian partner based on a stipulated parentage judgment obtained prior to the child's birth, which the biological mother was estopped from challenging].)

With this background in mind, we turn to a description of the limited issues presented for review in this case. As we have explained, the trial court determined that a presumption of parentage in favor of L.M. arose under section 7611, subdivision (d) based on the finding that L.M. received the Child into her home and openly held him out as her natural child. M.G. significantly limits the issues before us by expressly stating that she does not challenge the trial court's finding that L.M. received the Child into her home and openly held the Child out as her natural child within the meaning of the parentage presumption set forth in section 7611, subdivision (d).[4] Instead, M.G. makes the narrow legal argument that a presumption of parentage in favor of a second parent is necessarily rebutted as a matter of law whenever the child who is the subject of the parentage petition was adopted by his legal parent through a single parent adoption decree. As M.G. points out, *Elisa B.* (like *Charisma R.* and *E.C.*) did not address this issue because the child that was the subject of the parentage determination in that case was a *biological* child of the other lesbian partner, not an *adopted* child. Further, although *S.Y.* did concern the parentage of children *adopted* by the petitioner's lesbian partner, the court expressly declined to address the argument— similar to M.G.'s position—"that granting S.Y. presumed parent status circumvents adoption laws." (*S.Y., supra,* 201 Cal.App.4th at p. 1035, fn. 11 [issue expressly not reached because it was raised for the first time in the reply brief].)

## B. *M.G.'s Legal Arguments Lack Merit*

M.G. makes several alternative statutory arguments, each of which focuses on a different provision in section 7612 relating to the rebuttal of parentage presumptions that arise under section 7611. We consider each argument in turn.

### 1. *The Presumption of Parentage in Favor of L.M. Is Not Rebutted Under Section 7612, Subdivision (c) by the Adoption Decree Adjudging M.G. to Be the Child's Parent*

M.G.'s first argument is based on section 7612, subdivision (c), which provides that "[t]he presumption under Section 7611 is rebutted by a judgment establishing paternity of the child by another man." "In enacting section 7612, subdivision (c), the Legislature established a categorical rule that allows a presumption of fatherhood to be rebutted when a judgment of

---

[4] As the issue is not presented for review, we express no opinion on whether substantial evidence in the record supports a finding that L.M. received the Child into her home and openly held the Child out as her natural child within the meaning of section 7611, subdivision (d).

paternity already exists, thereby preventing the court from determining parentage if it had previously been judicially determined. . . . Stated another way, a section 7611 presumption is rebutted by a prior judgment because that 'judgment acts to preclude the issue of paternity from being *redetermined*.' " (*In re P.A.* (2011) 198 Cal.App.4th 974, 982 [130 Cal.Rptr.3d 556], citations omitted.)[5]

According to M.G., the 2001 adoption decree adjudging M.G. to be the Child's parent constitutes "a judgment establishing paternity of the child by another man" within the meaning of section 7612, subdivision (c) which conclusively rebuts the presumption arising under section 7611, subdivision (d) that L.M. is the Child's parent. M.G. contends that under section 7612, subdivision (c), a child who is adopted in a single parent adoption may not be adjudged to have a second parent under the UPA because the adoption decree constitutes a judicial determination that "this is not a two slot parent family. It is a one slot parent family. There is no extra (or second) parent slot for L.M. to occupy." M.G. states that the adoption decree is "a judgment vesting parentage and custodial care solely in M.G." and "[t]his family constellation has been judicially determined to be a single parent home."[6]

We disagree with M.G.'s characterization of the 2001 adoption decree. The adoption decree adjudged M.G. to be the Child's parent and was premised on the statutorily required finding that "the interest of the child will be promoted by the adoption." (§ 8612, subd. (c).) By virtue of the adoption, M.G. and the Child obtained "the legal relationship of parent and child and have all the rights and are subject to all the duties of that relationship." (§ 8616.) The adoption decree also operated to extinguish the parental rights of the Child's birth parents. (§ 8617 ["The birth parents of an adopted child are, from the time of the adoption, relieved of all parental duties towards, and all responsibility for, the adopted child, and have no right over the child."].) "The basic

---

[5] Case law discussing "a judgment establishing paternity of the child by another man" within the meaning of section 7612, subdivision (c) has concerned voluntary declarations of paternity made under section 7573, which are accorded the force and effect of a judgment of paternity (*Kevin Q. v. Lauren W.* (2009) 175 Cal.App.4th 1119, 1141 [95 Cal.Rptr.3d 477]; *In re Levi H.* (2011) 197 Cal.App.4th 1279 [128 Cal.Rptr.3d 814] (*Levi H.*)); paternity determinations made in connection with child support judgments (*In re Cheyenne B.* (2012) 203 Cal.App.4th 1361 [138 Cal.Rptr.3d 267]; *In re E.O.* (2010) 182 Cal.App.4th 722 [107 Cal.Rptr.3d 1]); and stipulated judgments of paternity (*Barkaloff v. Woodward* (1996) 47 Cal.App.4th 393, 399 [55 Cal.Rptr.2d 167]).

[6] M.G.'s contention that a single parent adoption decree is a judgment establishing paternity by another man within the meaning of section 7612, subdivision (c), which conclusively rebuts a presumption of parentage for a second person, presents a question of law and a matter of statutory interpretation, to which we apply a de novo standard of review. (See *Levi H., supra,* 197 Cal.App.4th at p. 1286.)

purpose of termination of parental rights and adoption is to promote the welfare, protection and betterment of the child by providing the security of a stable adoptive home when those conditions have been otherwise missing from the child's life, and to confer upon the new parents discretion to provide for the best interests of the adopted child unfettered by interference from the former relatives." (*In re Noreen G.* (2010) 181 Cal.App.4th 1359, 1391 [105 Cal.Rptr.3d 521]; see *Huffman v. Grob* (1985) 172 Cal.App.3d 1153, 1157–1158 [218 Cal.Rptr. 659]; *In re Kimberly S.* (1999) 71 Cal.App.4th 405, 409 [83 Cal.Rptr.2d 740].) The record contains no evidence that the issue of whether the Child could have only one parent was raised or decided in the adoption proceedings.

 Thus, although the adoption decree obtained by M.G. implicitly served as an adjudication that the Child's best interests were served by conferring parental status on M.G. and severing the Child's legal ties with his birth parents, there is no basis to characterize the adoption decree as establishing that, *regardless of future developments*, the Child should be limited to only one parent. It is now well established that a child raised in a same-sex relationship may have two mothers (*Elisa B., supra*, 37 Cal.4th at p. 119), and our Supreme Court has announced a "public policy favoring that a child have two parents rather than one" (*Kristine H., supra*, 37 Cal.4th at p. 166). Against this background, we reject M.G.'s interpretation of the adoption decree as a judgment establishing that the Child may have only one mother. We therefore also reject M.G.'s argument that a single parent adoption decree constitutes "a judgment establishing paternity of the child by another man" within the meaning of section 7612, subdivision (c) that rebuts any presumption of parentage in favor of a second parent.[7] Put simply, the adoption decree establishes that M.G. is the Child's mother, but it does not preclude a determination under the UPA that L.M. is the Child's *second* mother.

### 2. *No Weighing Is Needed Under Section 7612, Subdivision (b) Because There Are No Conflicting Claims or Presumptions*

M.G.'s next argument is based on section 7612, subdivision (b), which provides that "[i]f two or more presumptions arise under Section 7610 or 7611 that conflict with each other, or if a presumption under Section 7611 conflicts

---

[7] As it is unnecessary to our analysis, we do not decide whether, in other circumstances, an adoption decree could be described as "a judgment establishing paternity of the child by another man" within the meaning of section 7612, subdivision (c), or whether, on the contrary, a claim of parentage based on an adoption decree should be weighed against other presumptions or claims of parentage as provided in section 7612, subdivision (b).

with a claim pursuant to Section 7610, the presumption which on the facts is founded on the weightier considerations of policy and logic controls." (§ 7612, subd. (b).) M.G. contends that her parentage claim to the Child (which arises under § 7610, subd. (c) as an adoptive parent) conflicts with L.M.'s presumption of parentage. M.G. argues that the trial court should have weighed her claim against L.M.'s presumption, and should have decided that M.G.'s claim prevailed.[8]

We reject this argument because, as the trial court correctly pointed out, there is no conflict to resolve. As we have explained, a child raised in a same-sex relationship may have two mothers. (*Elisa B., supra*, 37 Cal.4th at p. 119.) L.M. seeks recognition as the Child's *second* mother. L.M. is not attempting to take away M.G.'s status as the Child's adoptive parent. Because the trial court was not called upon to decide *between* two competing parentage claims, this case does not pose a conflict that must be resolved by the weighing process described in section 7612, subdivision (b). (Cf. *K.M., supra*, 37 Cal.4th at p. 143 [noting that the parental claims of the former lesbian partners were "not mutually exclusive" and there was no need to decide between them as "K.M.. does not claim to be the twins' mother *instead of* E.G., but *in addition to* E.G."].)

3. *Under Section 7612, Subdivision (a), the Trial Court Was Not Required to Treat This as an Appropriate Action to Rebut the Parentage Presumption in Favor of L.M.*

M.G.'s final statutory argument relies on section 7612, subdivision (a), which provides that a presumption of paternity arising under section 7611 "is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence." (§ 7612, subd. (a).)

█ In cases where a presumption has arisen under section 7611 in favor of a person who is admittedly not the biological parent, courts have applied this provision to determine whether, under the unique facts of each case, it is an appropriate action to rebut the parentage presumption with clear and convincing evidence that the person is not a biological parent. (See, e.g., *Elisa B., supra*, 37 Cal.4th at p. 125 ["this is not an appropriate action in

---

[8] We apply a de novo standard of review to the legal question of whether a claim of parentage based on a single parent adoption decree *conflicts*—within the meaning of section 7612, subdivision (b)—with a presumption of parentage arising under section 7611, subdivision (d) in favor of a second parent. (See *Levi H., supra*, 197 Cal.App.4th at p. 1286.)

which to rebut the presumption that Elisa is the twins' parent with proof that she is not the children's biological mother . . ."]; *Nicholas H., supra,* 28 Cal.4th at p. 70 [not an appropriate action to rebut the presumption arising under § 7611, subd. (d) regarding a man who admitted he was not the biological father because no other man claimed parental rights to the child and rebutting the presumption would have left the child fatherless]; *In re Jesusa V.* (2004) 32 Cal.4th 588, 606–607 [10 Cal.Rptr.3d 205, 85 P.3d 2] [trial court did not abuse its discretion in deciding that it was not an appropriate action to rebut the parentage presumption that arose in favor of man who was not the biological father].) "The Supreme Court has repeatedly stated that section 7612[, subdivision ](a) should not be applied to rebut a presumption of fatherhood arising under section 7611[, subdivision ](d) where the result would be to leave children with fewer than two parents." (*In re J.O.* (2009) 178 Cal.App.4th 139, 148 [100 Cal.Rptr.3d 276]; see *Nicholas H.*, at p. 70 ["When it used the limiting phrase *an appropriate action*, the Legislature was unlikely to have had in mind . . . an action in which no other man claims parental rights to the child, an action in which rebuttal of the section 7611[, subdivision ](d) presumption will render the child fatherless."]; *Elisa B.*, at p. 122 [not an appropriate action to rebut the presumption, in part, because rebutting the presumption "would leave [the children] with only one parent"].)

The stated policy in favor of providing a child with two parents has led courts to conclude that it would not be an "appropriate action" to rebut a parentage presumption when that presumption arises in favor of a second parent of a child raised by a same-sex couple and there is no other person competing for the second parent position. (*Elisa B., supra,* 37 Cal.4th at pp. 122, 125; *Charisma R., supra,* 175 Cal.App.4th at p. 383; *S.Y., supra,* 201 Cal.App.4th at p. 1037.) The situation presented in this case fits squarely into that fact pattern, because L.M. and M.G. were a same-sex couple who decided together to bring the Child into their family to jointly raise him, and no other person is competing for the position of the child's second parent.[9] Based on *Elisa B.* and subsequent cases applying its holding, the trial court correctly determined that this case is not an appropriate action in which to rebut the presumption.[10]

---

[9] As we have explained, the determination of whether it is appropriate to rebut a parentage presumption depends on the unique facts of each case, and we accordingly express no view on whether under a different fact pattern involving an adopted child it may be appropriate to rebut a parentage presumption arising in favor of a person who was not the individual who legally adopted the child. We base our decision on the particular facts of this case.

[10] It is generally within the trial court's discretion to determine whether it is an appropriate action to rebut a parentage presumption pursuant to section 7611 (*Elisa B., supra,* 37 Cal.4th at p. 122, citing *In re Jesusa V., supra,* 32 Cal.4th at p. 606). Here, the trial court implicitly determined that this was not an appropriate action to rebut the presumption, as it made a parentage determination in favor of L.M. and noted specifically in its statement of decision that

However, presenting several related arguments, M.G. contends that this case is different and presents an "appropriate action" to rebut the presumption because she adopted the Child through a single parent adoption decree.

M.G. first argues that the trial court should have concluded that this is an appropriate action to rebut the presumption because a parentage determination in favor of L.M. would be "an improper collateral attack" on M.G.'s adoption decree. According to M.G., the adoption decree "vests single parenthood status from time of rendition" and "is not now . . . open to attack or to invasion from second parties or third parties." We reject this argument for the same reason that we concluded the adoption decree does not constitute a judgment establishing paternity by another man within the meaning of section 7611, subdivision (c). Specifically, there is no basis to treat the adoption decree as comprising the issue of whether, regardless of future developments, the Child should be precluded from having a second mother. The adoption decree served only to vest parent status in M.G. and cut off the legal rights of the Child's birth parents. As the adoption decree did not adjudicate the issue of whether the Child may only have one parent, L.M.'s parentage petition does not constitute an impermissible collateral attack on the adoption decree.

In a similar argument, M.G. contends that this is an appropriate action to rebut the parentage presumption in favor of L.M. because L.M. should be estopped from challenging M.G.'s adoption decree after the expiration of the limitations period set forth in section 9102, subdivision (a). According to that provision, with certain exceptions, "an action or proceeding of any kind to vacate, set aside, or otherwise nullify an order of adoption on any ground, except fraud, shall be commenced within one year after entry of the order." (§ 9102, subd. (a).) The limitations period set forth in section 9102, subdivision (a) does not apply here because L.M. does not seek to "vacate, set aside, or otherwise nullify an order of adoption." (*Ibid.*) L.M. does not challenge M.G.'s status as the Child's parent, and as we have explained, the adoption decree is not properly characterized as a judgment that the Child may have only one parent. (See *S.Y., supra*, 201 Cal.App.4th at p. 1035, fn. 11 ["Contrary to S.B.'s assertion, S.Y.'s parentage claim is not barred by the statutes of limitations applicable to actions seeking to challenge an adoption order. S.Y.'s parentage claim is based on section 7611[, subdivision ](d). She

---

there exists a policy in favor of a child having two parents. We apply an abuse of discretion standard of review to the trial court's determination. (*S.Y., supra*, 201 Cal.App.4th at pp. 1036–1037.)

does not seek to 'vacate, set aside, or otherwise nullify' the adoption order . . ." related to the children adopted by S.B.].)

██ M.G. also contends that the trial court should have concluded that this is an appropriate action to rebut the presumption because, through this action, L.M. seeks the equivalent of a stepparent adoption "without any of the required processes and without M.G.'s consent." We are not convinced. Adoption and an order determining parentage under the UPA are *alternative* methods for someone to establish parental status. Case law recognizes parental status under the UPA even when a stepparent adoption procedure was not followed during the time that the parents were together and cannot now be followed because the parents' relationship has ended. (*Charisma R., supra*, 175 Cal.App.4th 361; *S.Y., supra*, 201 Cal.App.4th 1023.)[11] Therefore, the fact that L.M. did not obtain a stepparent adoption, and instead seeks to establish parental rights through the UPA, does not necessarily make this an appropriate action in which to rebut the parentage presumption in favor of L.M.

In sum, M.G. has not established that, based on M.G.'s single parent adoption decree, this was necessarily an appropriate action to rebut the parentage presumption in favor of L.M.

## DISPOSITION

The judgment is affirmed.

Aaron, J., concurred.

---

[11] M.G. cites *In re Karen C.* (2002) 101 Cal.App.4th 932, 940–941 [124 Cal.Rptr.2d 677], in which the court stated that it was not expressing an opinion "on whether an undocumented de facto 'adoption' of the type effectuated here at the time of Karen's birth can be condoned by the courts in the face of the principles that adoption requires an expeditiously sought court decree; that parents cannot give their children away; that parents cannot commit their children into involuntary servitude to others; that the courts should not freely devise and recognize a form of de jure adoption not authorized by the Legislature; and that prescriptive rights should not ripen in favor of those who choose to turn their backs on all required legal formalities in favor of a private form of undocumented adoption." Relying on this language, M.G. argues that allowing a parentage determination in favor of L.M. without requiring the formalities of a stepparent adoption would be a disfavored type of " 'de jure adoption.' " (Quoting *Karen C.*, at p. 941.) The observations in *Karen C.* were made in the very different context of a woman who purported to "adopt" a child at birth by having the birth mother give a false identity to hospital staff, identifying herself as the woman who had agreed to raise the child. (*Id.* at p. 934.) Given the context, we do not understand the court in *Karen C.* to have been questioning whether a parentage determination in favor of a former lesbian partner who jointly raised her partner's child would impermissibly constitute a de jure adoption.

**HUFFMAN, Acting P. J,** Concurring.—I agree that the majority opinion is an accurate statement of California law, as interpreted by our Supreme Court. Accordingly, consistent with the direction provided by *Elisa B. v. Superior Court* (2005) 37 Cal.4th 108 [33 Cal.Rptr.3d 46, 117 P.3d 660], I concur in the result reached in the majority opinion.