Filed 11/12/14  In re L.M. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# **COPY**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| In re L.M., a Person Coming Under the Juvenile Court Law. | C072731 |
| SAN JOAQUIN COUNTY HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>L.M.,<br><br>Appellant. | (Super. Ct. No. J05988) |

Minor L.M. appeals from the juvenile court's orders denying M.W. presumed parent status and rescinding her status as a de facto parent.  We requested and received supplemental briefing from the parties on the adequacy of the Welfare and Institutions Code, section 300 (unless otherwise stated, statutory references that follow are to the Welfare and Institutions Code) petition to support jurisdiction and the appropriate remedy

1

should this court find error.  We conclude that the juvenile court erred in denying M.W.'s petition for presumed parent status.  We further conclude that the allegations in the section 300 petition did not support jurisdiction.  Accordingly, we reverse the findings and orders of the juvenile court which removed the minor from M.W.'s custody and took jurisdiction over L.M.

FACTS AND PROCEEDINGS

Minor L.M.'s biological mother, D.M., has an extensive history of mental health and substance abuse issues.  She has repeatedly failed in treatment programs, has been in and out of prison for years, and when not incarcerated, is transient.  D.M. has a history with the San Joaquin County Human Services Agency (the Agency).  Specifically, D.M. had four children prior to giving birth to L.M.  Her twin sons were declared dependent children in 2002.  D.M. failed to reunify with them and they were adopted in 2003. D.M.'s daughter was removed from her custody in 2004.  D.M. was not provided reunification services and the child was placed with her father.  D.M.'s fourth child was declared a dependent child in 2005 and D.M.'s parental rights were terminated in 2006.

D.M. gave birth to L.M. in September 2006.  When she gave birth, she was incarcerated in Chowchilla State Prison and the father's identity and whereabouts were unknown.  While being held in county jail in 2005, she met and befriended M.W., who was also incarcerated at the time.  D.M. asked M.W. to take and raise L.M., in order to avoid Agency involvement.

While in labor with L.M., D.M. provided the hospital with M.W.'s name, advised staff that M.W. was to be the child's temporary guardian, and listed M.W. as a cousin on the temporary guardianship papers she provided the hospital.  When the minor was born, D.M. gave the newborn to M.W. with the verbal agreement that M.W. would raise him.

In 2007, M.W. attempted to obtain legal guardianship over the minor.  Her petition was denied because she was still on probation following her release from custody.  The

matter was referred to the Agency on June 26, 2007, for review for a possible section 300 petition. The investigating social worker determined that at birth D.M. had left the minor with provisions by making arrangements for M.W., a family friend, to care for the minor during her incarceration. The social worker determined that, although M.W. had been denied a guardianship, the minor was able to remain in M.W.'s home based on the agreement between D.M. and M.W.

D.M. had been released from prison in June 2007, as well. She resumed using drugs and did not make any attempt to reunify with the minor. She did see the minor once in 2007, shortly after her release from custody when M.W., on her own initiative, brought the minor to the place where D.M. was staying. On that occasion, D.M. said she again asked M.W. to keep the minor until she was "situated." D.M. later admitted that the agreement was that M.W. was to have permanent full custody and raise L.M. as L.M.'s mother. The understanding was that D.M. would relinquish her rights to the minor but remain "in his life" to the extent that she would be permitted to visit "and stuff." D.M. signed a paper stating that M.W. was to care for the minor as she was not able to care for him. Thereafter, D.M. was reimprisoned and released multiple times but had no contact with M.W. or the minor for three years.

In the meantime, M.W. was raising L.M. M.W. paid for all the minor's expenses. She enrolled him in school and took him to medical appointments, representing herself as his mother. If she was questioned because her name was not on his birth certificate, she would explain that D.M. was the minor's biological mother but that she was raising him. She had been provided the minor's birth certificate and immunization records by hospital staff after the minor's birth.

The minor had a speech impediment and problems following directions, so he was seeing a speech therapist and participating in an individualized education plan (IEP) at school.

On school records, M.W. is listed as the minor's mother. All of the minor's teachers, as well as the parents of L.M.'s friends, understood M.W. to be the minor's mother. M.W. did, however, explain that D.M. was the minor's biological mother but that she was raising him when she enrolled him in the IEP at school because it was important they know such things. M.W. took the minor to church every Sunday and everyone at the church knew L.M. as M.W.'s son. L.M. has been involved in all M.W.'s family activities since his birth and, even though M.W.'s immediate family knew she was not his biological mother, they treated him as a family member. The minor, himself, refers to M.W. as his mother and had no knowledge she was not his biological mother.

M.W. had attempted to obtain Aid to Families with Dependent Children (AFDC) funds early on, but was denied because she was not related to the minor. She applied again in 2010, falsely claiming to be the minor's cousin, and received aid for L.M.'s childcare, cash aid, and food stamps.

Unlike the previous times she was released from incarceration, D.M. decided to try to see the minor after her release in 2010, but she did not have M.W.'s contact information. Upon the advice of a pastor, she filed a missing person report. In response, both M.W. and M.W.'s probation officer called D.M. at His Way Fellowship (a rehabilitation program), where D.M. was staying. M.W. arranged to bring the minor to D.M. for a visit. They initially planned for a visit on the first weekend, but M.W. had previously committed to take the minor on a camping trip. When M.W. tried to call D.M. after the camping trip, D.M. had already left His Way Fellowship--providing no forwarding contact information. D.M. resumed using drugs and was reincarcerated.

According to D.M., the next time she saw M.W. was after her release from incarceration several months later. D.M. said she saw M.W. in an area known for drug sales. D.M. said M.W. asked her to purchase drugs for her. D.M. saw the minor was not in the car and asked where he was. M.W. said she did not often do drugs and was still

4

caring for the minor. D.M. said she purchased the drugs for M.W. D.M. was thereafter reincarcerated.

D.M. was released again from incarceration in February 2012. She reentered rehabilitation, discovered she was pregnant again, and decided she wanted to be involved in L.M.'s life. Accordingly, she contacted police. The detective knew where M.W. and the minor were, but contacted the Agency because of D.M.'s history with child protective services.

On May 4, 2012, a social worker and a law enforcement officer went to M.W.'s house and spoke with her. M.W. had been unaware that the missing person report had remained pending. Her home was clean but she had no food, as she was planning to grocery shop that day.

The Agency filed a section 300 petition on behalf of L.M. on May 8, 2012. The petition alleged the minor fell within the provisions of subdivisions (b) (failure to protect), (g) (no provision for support), and (j) (abuse of sibling). The specific allegations of the petition will be discussed *post*. In general, it was based upon D.M.'s failure to reunify with her older children, the whereabouts of L.M.'s father being unknown, the allegations that D.M. had mental health and drug abuse issues, and the fact that D.M. had not cared for the minor since his birth nor was she able to adequately do so.

M.W. applied for and was granted de facto parent status. D.M. did not contest the petition and the juvenile court found the allegations admitted and, therefore, true. The minor was subsequently placed on an extended "visit" in M.W.'s home.

On August 8, 2012, M.W. filed a petition for presumed parent status pursuant to the Uniform Parentage Act. The petition sought presumed parent status under Family Code section 7611, subdivision (d), which provides for presumed parent status when the individual receives the child into his/her home and openly holds the child out as his or her own.

5

After hearing the testimony of M.W. and D.M., the juvenile court denied M.W.'s petition for presumed parent status and terminated her de facto parent status. In so ruling, the juvenile court found that M.W.'s application for guardianship was inconsistent with holding the minor out as her own because, in making the application, she admitted she was not the minor's parent. Additionally, the juvenile court found that it could not "condone" the "fraud against the government to obtain funds," in reference to M.W.'s AFDC application, or the "fraud" M.W. committed in knowing D.M. was going around child protective services by having M.W. raise the minor. The juvenile court stated that the denial of M.W.'s petition for presumed parent status and the termination of her de facto parent status was "all based on the fraud."

The minor appeals. We deemed the predispositional order appealable. The juvenile court subsequently set a section 366.26 hearing, which we stayed pending resolution of this appeal.

DISCUSSION

I

*Presumed Parentage*

"Designation as a presumed parent is critical in dependency proceedings because it entitles the presumed parent to appointed counsel, custody absent a finding of detriment and a reunification plan (§§ 317, subd. (a); 361.2, subd. (a); 361.5, subd. (a))." (*In re Salvador M.* (2003) 111 Cal.App.4th 1353, 1357 (*Salvador M.*).) A person may be presumed to be the natural parent of a child if he or she receives the child into his or her home and openly holds the child out as his or her natural child. (Fam. Code, § 7611, subd. (d) [presumed father]; *In re Karen C.* (2002) 101 Cal.App.4th 932, 938 [presumed mother].) Once the presumption of parentage arises, it may be rebutted in an appropriate action only by clear and convincing evidence. (Fam. Code, § 7612.)

6

Presumptive parent-child relationships, regardless of their lack of foundation in biology, are protected because society has an interest in preserving and protecting the developed parent-child relationships that give children social and emotional strength and stability.  (*Steven W. v. Matthew S.* (1995) 33 Cal.App.4th 1108, 1116.)  The presumptions are driven by the state's interest in the welfare of the child and the integrity of the family.  (*In re Nicholas H.* (2002) 28 Cal.4th 56, 65 (*Nicholas H.*).)  The familial relationship resulting from years of living together in a purported parent/child relationship "should not be lightly dissolved."  (*Ibid*.)

"We review a lower court's determination of presumed [parentage] status for substantial evidence."  (*Salvador M., supra,* 111 Cal.App.4th at p. 1358.)  However, to the extent we are called upon to review the juvenile court's legal interpretation of the "receiv[ing]" and "hold[ing] out" requirements set forth in Family Code section 7611, subdivision (d), we shall exercise our independent legal judgment.  (See *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799; accord *S.Y. v. S.B.* (2011) 201 Cal.App.4th 1023, 1031 (*S.Y.*).)

Here, it is uncontroverted that M.W. received the minor into her home.  She brought him to her home from the hospital as a newborn, where he lived and she was his sole caretaker until these proceedings were instituted.  (See *In re Kiana A.* (2001) 93 Cal.App.4th 1109, 1116-1117.)  Thus, M.W. satisfied the first element required to establish presumed parent status under Family Code section 7611, subdivision (d).

M.W. also had to prove by a preponderance of the evidence that she held the minor out to be her natural child.  (Fam. Code, § 7611, subd. (d).)  Factors often considered in making this determination include the individual's contribution to prenatal care, pregnancy and birth expenses; whether the person seeking presumed parent status promptly took legal action to obtain custody of the child or sought to have his/her name placed on the birth certificate; whether and how long he or she cared for the child; whether there is unequivocal evidence that he or she had acknowledged the child; the

7

number of people to whom he or she had acknowledged the child; whether he or she provided for the child after it no longer resided with him or her; whether, if the child needed public benefits, he or she had pursued completion of the requisite paperwork; and whether his or her care was merely incidental. (*In re T.R.* (2005) 132 Cal.App.4th 1202, 1211.) The existence of these factors, however, are not necessary or inclusive. (*E.C. v. J.V.* (2012) 202 Cal.App.4th 1076, 1086-1087.) The essence of the inquiry is whether, through her conduct, M.W. demonstrated a commitment to the minor and his well-being, thereby distinguishing herself as someone who has entered into a familial relationship with the minor from someone who has not. (*Ibid.*)

Here, the evidence established that M.W. agreed to raise the minor even prior to his birth, was his sole caretaker, and provided for all his needs, including the arrangement of his special educational assistance. She openly and publicly asserted her parentage in various forums and to numerous people. She enrolled the minor in school and took him to medical appointments, representing herself as his mother. The minor's teachers and the parents of the minor's classmates all knew M.W. as the minor's mother, as did the members of M.W.'s church. In fact, demonstrating the extent to which M.W. held the minor out as her own, the six-year-old minor did not know M.W. was not his biological mother until these proceedings were instituted.

*Salvador M., supra,* 111 Cal.App.4th 1353, involved a three-year-old child who, after his biological mother was killed in a car accident, was raised by his adult half sister. The half sister had been raising the child, along with her biological child, for five years when the child entered the dependency system. The court concluded that the half sister had openly held the child out as her own, despite admitting to various officials that she was the child's half sister. The court noted that "the most compelling evidence" that she held the child out as her own was that the eight-year-old child "believed appellant was his mother" which supported the conclusion that she held the child "out to the community as

8

her son." (*Id*. at p. 1358.) Here, as demonstrated in *Salvador M*., the evidence is unequivocal that M.W. held L.M. out as her natural son.

The juvenile court found that M.W.'s application for guardianship was inconsistent with holding the minor out as her own because, in making the application, she admitted she was not the minor's parent. We disagree with that conclusion. The fact that M.W. admitted she is not the minor's biological mother does not necessarily mean that she did not hold him out as her natural child under Family Code section 7611. (*Elisa B. v. Superior Court* (2005) 37 Cal.4th 108, 120; *Nicholas H., supra,* 28 Cal.4th at p. 65; *Salvador M.*, *supra*, 111 Cal.App.4th at p. 1358.) Along similar lines, we explained in *E.C. v J.V., supra,* 202 Cal.App.4th at p. 1090, that the failure to claim a minor on one's income tax returns *may* be appropriate evidence to consider in evaluating an alleged parent's commitment to a child, but if the alleged parent is precluded by law from claiming the child on her tax returns, the failure to do so does not carry much weight.

Likewise, M.W.'s recognition of the limitations of her legal status, or the benefits of formalizing her legal rights in order to care for the minor, is more a demonstration of her assertion of legal responsibility and commitment to the minor than a repudiation of her status as his parent. (See, e.g., *S.Y., supra,* 201 Cal.App.4th 1023 [former partner of mother who initially sought but abandoned being named child's guardian still found to be child's presumed parent].) For this same reason, M.W.'s admission of her nonbiological relationship to the minor to IEP/school officials in arranging for the minor's special education was not inconsistent with holding the minor out as her own.

As in *Salvador M.*, this is not "an appropriate action" in which to rebut the presumption of presumed parentage with proof that M.W. is not the minor's biological parent. (See, *In re Nicholas H, supra,* 28 Cal.4th at p. 70 [proof that a petitioner is not the biological parent of the child does not by itself rebut the statutory presumption where the result would be that the minor is left fatherless].)

9

Whether D.M. intended that M.W. obtain a legal right to the minor is immaterial. The fact is, D.M. arranged for M.W. to parent the minor prior to his birth and continued to support that arrangement for years following his birth. (See *S.Y.*, *supra*, 201 Cal.App.4th at pp. 1034-1035.) M.W. voluntarily accepted all of the obligations of parenthood from the time of the minor's birth and there are no competing claims to her being the minor's second parent. (*Id*. at pp. 1036-1037; *Elisa B. v. Superior Court*, *supra*, 37 Cal.4th at p. 122.) "To sever this deeply rooted mother/child bond would contravene the state's interest in maintaining the family relationship." (*Salvador M.*, *supra*, 111 Cal.App.4th at p. 1359.)

We next address the juvenile court's denial of M.W.'s petition for presumed parent status based on the "fraud against the government to obtain funds," in reference to M.W.'s AFDC application, and the "fraud" M.W. committed in knowing D.M. was going around child protective services by having M.W. raise the minor. Although the juvenile court did not mention, or otherwise refer to, the unclean hands doctrine, the Agency argues that the doctrine provides an appropriate foundation for the juvenile court's ruling.

The doctrine of unclean hands applies to deny a plaintiff recovery when the plaintiff "has violated conscience, good faith or other equitable principle in his prior conduct." (*Lynn v. Duckel* (1956) 46 Cal.2d 845, 850.) The doctrine "applies when it would be inequitable to provide the plaintiff any relief, and provides a complete defense to both legal and equitable causes of action." (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 56.) It does not apply when the "improper conduct [is] not necessarily connected with the transaction particularly involved." (*Watson v. Poore* (1941) 18 Cal.2d 302, 313.) In other words, "[t]he actions of the party alleged to have soiled hands must relate 'directly to the transaction concerning which the complaint is made; i.e., *it must pertain to the very subject matter involved and affect the equitable relations between the litigants.*' " (*Pond v. Insurance Co. of North America* (1984) 151 Cal.App.3d 280, 290; italics added.)

10

"Whether the doctrine of unclean hands applies is a question of fact." (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978.) We will not disturb that finding on appeal if it is supported by substantial evidence. (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 42-43.) However, "[a] discretionary order that is based on the application of improper criteria or incorrect legal assumptions is not an exercise of informed discretion, and is subject to reversal even though there may be substantial evidence to support that order. [Citations.]" (*Mark T. v. Jamie Z.* (2011) 194 Cal.App.4th 1115, 1124-1125.)

The doctrine of unclean hands does not apply to prevent M.W. from being declared L.M.'s presumed parent. First, M.W.'s earlier dishonesty on her 2010 AFDC application, claiming to be the minor's cousin, was not necessarily connected to her assertion of presumed parent status in these dependency proceedings. It did not directly relate to her petition, did not pertain to the same subject matter, and did not affect the equitable relations between the litigants in this case. (See *Pond v. Insurance Co. of North America*, *supra*, 151 Cal.App.3d at p. 290.) Thus, M.W.'s conduct in connection with her AFDC application cannot form the basis for application of the unclean hands doctrine in connection with her petition.

With respect to M.W.'s agreement to raise the minor in order to prevent the Agency from removing the minor from D.M.'s care, the "fraud" or unconscionable nature of this conduct is unclear. The Agency provides no authority for the proposition that a mother is not permitted to arrange for the care of her child by another when she, herself, is unable to provide adequate care. Indeed, it is a parent's *failure* to do so that establishes grounds for dependency jurisdiction. (§ 300, subd. (g).) Moreover, the Agency became aware of the arrangement between D.M. and M.W. back in 2007, after M.W. attempted to obtain legal guardianship over the minor. The investigating social worker discovered that D.M. had left the minor with provisions by making arrangements for M.W to care for the

11

minor, yet the Agency took no action.  The Agency cannot be permitted to claim, five years later, that it was defrauded and its position in this case unfairly compromised.

Finally, as we have explained, the purpose of the presumed parent designation is to protect the child's interest in established familial relations.  The relationship between the litigants in this matter include, primarily, the relationship between the child and his parents.  The courts must take care in applying the unclean hands doctrine to address an adult's misconduct when to do so would inflict undue harm on the child.  (See generally *In re T.R.*, *supra*, 132 Cal.App.4th at p. 1209 ["Paternity presumptions are driven . . . by the state's interest in the welfare of the child and the integrity of the family"]; see also *In re Karen C., supra,* 101 Cal.App.4th at p. 936 [minor's contention that individual is her presumed parent not defeated by unclean hands doctrine because no evidence minor ratified or participated in the parent's misconduct].)  As the California Supreme Court has emphasized, the familial relationship resulting from years of living together in a purported parent/child relationship "should not be lightly dissolved."  (*Nicholas H.*, *supra*, 28 Cal.4th at p. 65.)  Denying M.W.'s petition for presumed parent status, based on conduct that is marginally, if at all, morally culpable, so as to tear from the minor the only parent he has ever known, is an improper application of the unclean hands doctrine.

In sum, we conclude M.W. established an unrebutted presumption of parentage. Having concluded she is L.M.'s presumed parent, the appropriate resolution of this appeal turns on whether there is any basis in the record to support jurisdiction over the minor.

II

*Jurisdiction*

Before the juvenile court can exert jurisdiction over a minor under section 300, there must be allegations and evidence establishing at least one ground for juvenile court jurisdiction.  (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 399-400.)  The section 300

petition must contain " '[a] concise statement of facts, separately stated, to support the conclusion that the [child] upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted.' " (*Id.* at p. 396.)

Here, the section 300 petition alleged L.M. fell within the provisions of subdivision (b), in that D.M. could not safely care for L.M. due to her mental health issues, substance abuse issues, unstable lifestyle, and history of repeated incarcerations. D.M. has struggled with mental health issues since she was a young child. She has been diagnosed with depression, polysubstance dependency, borderline personality disorder, schizoaffective disorder, and personality disorder. She has been prescribed medication and counseling but she does not maintain compliance of any length of time. Her mental health issues have been documented throughout the years because she was, herself, a foster child. Her history of substance abuse include use of "crack," but D.M. claimed to have been clean and sober for 37 days. D.M. is aware of resources to address her dual diagnosis but has failed to participate.

At the time the section 300 petition was filed, the social worker reported that D.M. was claiming she had attempted to get L.M. back, but M.W. was being elusive and she had been unable to locate the minor. Although D.M. testified at the hearing regarding presumed parent status that she had given L.M. to M.W. to raise, without restriction, she had told the social worker she had given the minor to M.W. to raise until she was able to care for him herself. Additionally, although D.M. testified at the hearing regarding presumed parent status that she did not object to M.W. as the minor's continued caretaker, she had told the social worker that she did not so consent.

Accordingly, with respect to subdivision (b), the petition alleged D.M. had never cared for the minor, as she gave birth to him in 2006 while incarcerated and gave the newborn to her cellmate, M.W., who was being released from custody, in order to avoid Agency involvement. The minor had been in M.W.'s custody ever since. D.M. had been

13

released from prison in 2007 but was unable to locate M.W. She eventually saw the minor and M.W. on one occasion and again asked M.W. to keep the minor until she was "situated." D.M. was thereafter in and out of prison but had no contact with M.W. or the minor until 2010. D.M. filed a missing person report in 2010. In response, M.W. contacted D.M. and urged her to keep "the White Man" out of it, but D.M. claimed M.W. gave her a false address and she had not been able to take custody of the minor. M.W. had also attempted to obtain legal guardianship but the petition was denied because M.W. was still on probation at the time.

The petition further alleged that D.M. has a lengthy history with the Agency and the juvenile dependency court, and does not have any of her other four children in her care. D.M. had been provided substance abuse and mental health services after her twins were declared dependents in 2002, but she failed to reunify with them and her parental rights were terminated. She was not provided services after her daughter was declared a dependent in 2004, and that minor was reunified with the father. She was not provided services after her son was declared a dependent in 2005 after two psychological evaluations indicated she would not benefit, and her parental rights were terminated.

The petition alleged the minor fell within the provisions of subdivision (g) in that the father's identity and whereabouts are unknown. D.M. reported that the father might be a man with the street name of "Face" who had reportedly been killed, or might be a man she met at a shelter, for whom she had a name but no contact information. Thus, the father had made no provision for support.

Finally, the petition alleged the minor fell within the provisions of subdivision (j), based on D.M.'s other children having all been declared dependents, D.M.'s loss of custody as to all four of those children, and her loss of parental rights as to three of them.

The allegations in the petition are sufficient to establish that a child in D.M.'s care is at substantial risk of serious physical harm or illness. (§ 300, subd. (b).) The allegations are also sufficient to establish D.M. abused or neglected the minor's half

14

siblings and there is a substantial risk that she would also abuse or neglect L.M. if he were in her care. (§ 300, subd. (j).) But in this case, D.M. is not the minor's custodial parent. Nor are there any allegations in the petition that D.M. was assuming immediate custody of the minor.

The section 300 petition alleges that M.W., rather than D.M., is the minor's caretaker. D.M. conceded jurisdiction before M.W. could establish parental status and contest it on the basis of being the minor's custodial parent. But, as we have explained herein, it was established at the postjurisdiction hearing on M.W.'s petition that M.W. was, in fact, the minor's custodial parent. There are, however, no allegations in the section 300 petition that the minor was at risk in M.W.'s care. Thus, the allegations of the petition and facts in support thereof fail to support juvenile court jurisdiction.

DISPOSITION

The orders of the juvenile court are reversed. The trial court is directed to grant M.W.'s request to be declared L.M.'s presumed parent and dismiss the section 300 petition. Accordingly, the subsequent judgment of disposition is vacated and L.M. is to be returned to M.W.'s custody. Having served its purpose, the stay of the section 366.26 hearing issued by this court on July 10, 2013, is vacated upon finality of this opinion.

Our disposition in this matter is without prejudice to the Agency's filing of section 300 petitions relating to the minor should the need arise.

                                                        HULL              , J.

We concur:

      BLEASE         , Acting P. J.

      NICHOLSON     , J.

15